In the Matter of the **NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.**

**Bankruptcy No. 30226.**

United States District Court
D. Connecticut.

Aug. 13, 1968.

See also D.C., 281 F.Supp. 65.

Migdal, Low, Tenney & Glass, by Lester C. Migdal and Lawrence W. Pollack, New York City, for Bondholders' Committee.

Dewey, Ballantine, Bushby, Palmer & Wood, by Wilkie Bushby and Joseph Schreiber, New York City, for Chase Manhattan Bank.

Simpson, Thacher, & Bartlett, by Albert X. Bader, Jr., Horace J. McAfee, and John J. McGraw, New York City, for Manufacturers Hanover Trust Co.

Carter, Ledyard & Milburn, by Walter A. Kernan and Richard McLaren, New York City, for United States Trust Co. of New York.

Myron S. Isaacs, New York City, and Homer Kripke, Jersey City, N. J., for Oscar Gruss & Son.

Alexander & Green, by J. Kenneth Campbell, New York City, for Erie-Lackawanna Railroad Co.

Robert W. Ginnane, Gen. Counsel and Leonard S. Goodman, Asst. Gen. Counsel, for Interstate Commerce Commission.

Debevoise, Plimpton, Lyons & Gates, by Roswell B. Perkins, Francis T. Plimpton, Robert L. King, Harvey J. Goldschmid, William G. Bardel; and Gerald E. Dwyer, Ulrich Schweitzer, New York City, and Windsor F. Cousins, Philadelphia, Pa., for Pennsylvania New York Central Transportation Co.

Sullivan & Worcester, by Joseph Auerbach, and Morris Raker; Boston, Mass., and Robert M. Peet, New York City, James W. Moore, and Robert W.

Blanchette, New Haven, Conn., for Richard Joyce Smith and William J. Kirk.

Louis J. Lefkowitz, Atty. Gen., and Walter J. Myskowski, Washington, D. C., for the State of New York.

Robert K. Killian, Atty. Gen., and Samuel Kanell, Hartford, Conn., for the State of Connecticut.

Elliot L. Richardson, Atty. Gen., and Christopher Armstrong, South Byfield, Mass., for the Commonwealth of Massachusetts.

Herbert F. De Simone, Atty. Gen., and Robert M. Schacht, Providence, R. I., for the State of Rhode Island.

Armistead B. Rood, Providence, R. I., for Boston & Providence R.R. Stockholders Development Group.

## MEMORANDUM OF DECISION ON REORGANIZATION PLAN

ANDERSON, Circuit Judge (sitting by designation).

On March 29, 1968, pursuant to §§ 77 (d and e) of the Bankruptcy Act, the Interstate Commerce Commission certified to this court the first step of a plan of reorganization of the Debtor, the New Haven Railroad, which it had approved by its order of November 16, 1967.[1] Shortly thereafter the court gave due notice to all parties in interest of the time within which objections to the plan might be filed and of the date, subsequent thereto, when the parties would be heard for or against "such objections to the plan," and on any claims for equitable treatment. On April 8, 1968 this court appointed the Honorable John Van Voorhis as Special Master, under the authority of § 77(c) (13) of the Bankruptcy Act, to hear and report respecting the New Haven's right, title or interest in the Grand Central Terminal properties. Thereafter Judge Van Voorhis held hearings, took evidence and filed a report on June 18, 1968, and a supplemental report on June 24, 1968. Following preliminary hearings a final hearing was held by this court on July 26, 1968 on the plan and on the reports of the Special Master. All the points raised have been both briefed and orally argued, and the matter is now fully submitted to this, the reorganization court.

In addition to the procedure provided under § 77(e), the First Mortgage 4% Bondholders Committee, The Chase Manhattan Bank, Trustee, Manufacturers Hanover Trust Co., Trustee, United States Trust Co., Trustee, and Oscar Gruss & Son (hereinafter collectively referred to as "the bondholders") appealed to a three-judge court in the Southern District of New York under Title 28 U.S.C. § 2284 on the ground that the terms and conditions of the inclusion of the New Haven in the Penn-Central under the plan were not just and reasonable, or equitable, as required by §§ 5(2) (b) and (d) of the Interstate Commerce Act. That court, consisting of Circuit Judge Friendly and District Judges Weinfeld and Levet, heard the case and later filed its decision July 10, 1968, New York, New Haven and Hartford Railroad Co. v. United States, 289 F.Supp. 418 (S.D.N.Y. 68 Civ. 296). Many of the issues raised in the three-judge court are also before this court and, where the three-judge court did not adopt the position urged by one of the parties, that party has in most instances renewed its claim here by attacking the rationale of the three-judge court in deciding such issues. That court remanded the case to the Commission for further proceedings consistent with its opinion; and, in conformity with the views of all parties, this court likewise refers the proceedings back to the Commission for further action. In so doing this Court intends to leave the Commission the maximum flexibility of decision within the general guidelines set by this court and the three-judge court.

The two principal questions now before the reorganization court are: (1)

---

1. Pennsylvania R.R.—Merger—New York Central R.R., 331 I.C.C. 643 (1967).

whether or not the standard of value which the New Haven is entitled to receive for the transfer of its assets to the Penn-Central is its liquidation value as of December 31, 1966 or some other measure of worth, together with the accompanying question of whether the Commission conformed to the proper standard in its order of November 16, 1967; and (2) whether the time is now foreseeable in the near future when the continued deficit operation of the New Haven in the public interest at the expense of the creditors must be held to be a taking of their property without due process or just compensation, in violation of the Fifth Amendment to the Federal Constitution.

■ Before discussing these major points further mention should be made of the general constitutional principles which bear on their solution. While the power provided under the Bankruptcy Act is broad and ample,[2] the Constitution places limits on the exercise of that power by both Congress[3] and the courts.[4] The due process clause of the Fifth Amendment, for example, protects the rights of creditors from unlawful invasion by either Congress or the courts.[5] As the rights of creditors cannot be arbitrarily sacrificed or restricted, the creditors of the New Haven are entitled to a constitutional minimum of value for the property to be sold to the Penn-Central, which, on its part, is entitled to be required to meet only equitable terms. The constitutional and equitable principles, however, are sufficiently flexible that a proper value may be arrived at which is fair to all parties. This court is of the opinion that it faces an even more serious problem which is the continuing and accelerating wasting away of the Debtor's estate through operating losses while the legal processes for determining value go on and the consummation of actual inclusion is deferred.

■ In expressing its own view concerning the proper standard of valuation it should still be borne in mind that the court does so primarily to furnish a guideline; and in making its own determination the Commission should make all necessary findings relevant, not only to that standard, but also those essential to such other theory of price determination as the Commission may adopt if it is in disagreement with the liquidation measure of valuation. It is the opinion of the court that the Penn-Central should pay to the Trustees of the New Haven at least the liquidation value of the New Haven as of December 31, 1966. This is so not because the Constitution necessarily requires it but because that standard, under the circumstances of this case, is fair both to the creditors and to the Penn-Central.

■ Some of the parties have asked the court to reject this standard and argue in favor of a "going concern value" while others seek the adoption

---

2. 1 Collier, Bankruptcy, ¶ 0.02 at 5 (14th ed.1968).

3. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (Federal Frazier-Lemke Act of 1934 violated due process clause of Fifth Amendment). The amendatory act of 1935 was thereafter sustained as constitutional. Wright v. Vinton Branch of Mountain Trust Bank, etc., 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937). See also Ashton v. Cameron County Water Improvement Dist. No. One, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936) (Municipal Debt Readjust- ment Act was an unconstitutional infringement on state sovereignty). The constitutionality of the second Municipal Debt Readjustment Act was sustained in United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938).

4. Continental Ill. Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

5. See Louisville Joint Stock Land Bank v. Radford, supra, note 3; Continental Ill. Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., supra, note 4.

of a "fair upset value," but these proposed alternatives are wholly inappropriate for the attendant conditions of the present reorganization. The concept of "going concern value" is fictional as applied to the New Haven because it ignores the Railroad's long and continuous history of deficit operations.[6] Indeed, as later noted herein the New Haven's operations must soon terminate. With regard to "fair upset value" it is difficult to see how, in applying it to the New Haven under the circumstances of the reorganization, it would differ at all from "fair liquidation value." The term "fair upset price" in its ordinary meaning refers to the lowest price which would be accepted for an item offered for sale at an auction. From this beginning it was borrowed and used extensively in equity reorganizations which were designed to recapitalize a viable corporation which had operating income,[7] and in this connection was used to force minority security holders into accepting the plan. In other instances the upset price was fixed for the purpose of protecting such minority interests. In any event, it was principally used against co-security holders rather than against a third party such as Penn-Central.[8] In connection with a corporation as moribund as the New Haven, fair upset price is analogous to "fair market" or "liquidation" value, although there is some authority that it may be less, at least where the purchaser is a public authority.[9]

■ Turning to a somewhat fuller discussion of liquidation value we start with the bondholders argument that the value fixed as of December 31, 1966 must be treated as a fixed and immutable constitutional minimum which cannot be diminished by subsequent deficit operation of the Railroad. Both the Commission and the courts, however, have reiterated in this and in related proceedings that as bondholders of a railroad their interests are subject to such invasion as may be essential to continue the operation of the railroad for a reasonable period of time to provide an opportunity to work out a permanent plan or means of continuing the operation, if possible, to the extent that it is required by the public interest.[10]

6. The last year in which New Haven realized any net railway operating income was 1957. Since that time the deficit in net railway operating income has varied from a low of $3,855,547 in 1958 to a high of $20,179,000 in 1967. See Petition for Order No. 404, Printed Record pp. 4443, 4446, New York, N. H. & H. R. Co. Discontinuance of Trains, 327 I.C.C. 151, 166 (1966), and Pennsylvania R.R.—Merger—New York Central R.R., 331 I.C.C. 643 (1967), Appendix D and infra in the text.

7. See, e.g., Glenn, Liquidations § 433 at 611; 6 Collier ¶ 0.04 [2.2]; 4 Moore, Federal Practice (2d ed.) ¶ 24.11.

8. 6 Collier, Bankruptcy, ¶ 0.04 [2.2]; 15 Fletcher, Private Corp., § 7272, n. 58 (perm.ed.rev.1961).

In foreclosure sales, particularly in the case of railroad mortgages, the real bidder at the sale was usually the holder of the majority interest in the bonds. Since he would be allowed to pay off a percentage of his bid in bonds it was to the majority holder's interest to bid as low as possible. Under these circumstances it was necessary for the protection of minority interests to have the court set a minimum price below which no sale would be confirmed. This was the "upset price." Glenn, Liquidations § 433, at 611; Guaranty Trust Co. of New York v. Chicago. M. & St. P. Rwy. (E.D.Ill. 1926) 15 F.2d 434.

Several bases for establishing upset price are discussed in II Bonbright, Valuation of Property, p. 850, and in Weiner, Conflicting Functions of the Upset Price, 27 Colum.L.Rev. 132, 139 (1927).

9. New York Trust Co. v. Portsmouth & Exeter St. Rwy., 192 F. 728 (C.C.D.N.H. 1911); 2 Gerdes, Corporate Reorganizations, § 1062 (1936 ed.); 7 Fletcher, Private Corporations, § 3290 at 447 (perm.ed.rev.vol.1964).

10. Pennsylvania R.R.—Merger—New York Central R.R., 331 I.C.C. 643, 704; Penn Central Merger and N. & W. Inclusion Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L. Ed.2d 723 (1968); cf. In Re Third Ave. Transit Corp., 198 F.2d 703, 707 (2 Cir. 1952).

Throughout the reorganization proceedings the parties, the Trustees and the court have been aware of the duty and necessity resting upon the Trustees to preserve the assets of the Debtor's estate for the creditors on the one hand, and, on the other hand, the obligation in the public interest, to keep the Railroad going, even as a deficit operation. For a time this dichotomy of purposes ran in parallel, but before long they began to assume collision courses. A brief resume of the history may be helpful.

The petition for reorganization in this case was filed on July 7, 1961. The immediate problem of the Trustees was to stem the cash loss, then flowing out at the rate of $1,500,000 per month. By increasing the efficiency of operation, imposing strict economies and deferring certain payments this cash loss was arrested in 1962, although cash attrition began again to present a problem in 1964.[11] At first it was thought possible that the Railroad might operate as a carrier of freight only or with greatly reduced passenger service. There was also a flurry of interest by the four States concerned and the federal Government which raised the hope that sufficient grants would be provided to enable the Railroad to operate on a break-even basis. But, except for full tax relief and substantial grants by Connecticut and partial tax relief and smaller grants by New York, and Rhode Island, no subsidies or prospects of subsidies of a size sufficient to make up for the operational losses were forthcoming. The gains achieved by the Trustees were soon wiped out by a series of increases in wages, increased cost of materials, equipment and supplies and severe competition from trucks, automobiles, planes and sea

borne traffic. Meanwhile, an application of the Pennsylvania and New York Central Railroads to merge was filed on March 9, 1962. Consistently with the Trustees' previously held opinion that a merger with a large trunk line railroad would be the most promising and feasible means of continuing the viability of the New Haven's transportation system, they at once sought inclusion in a merged Penn-Central system.[12] Before the Commission had acted they also, forehandedly negotiated a contract with the Pennsylvania and New York Central for the inclusion of the New Haven in a merged Penn-Central to protect the New Haven in the event that the Commission did not require the inclusion as a condition of the merger.[13] While the preservation of the New Haven was not the sole justification for the approval of the Penn-Central merger, this promising solution for the very difficult New Haven problem, demanded by the public interest, was undoubtedly a make-weight which had a definite effect on tipping the balance in favor of the approval of the merger. It was about the only inducement which could bring Pennsylvania and New York Central to make such an agreement with the New Haven.

By about 1963 it became apparent that the inclusion of the New Haven in the Penn-Central merger was the only salvation for the New Haven as an operating railroad, and at that time it was thought to be the solution which best served the interests of the creditors as well as the public interest. But by March 27, 1967, when the Supreme Court remanded the Penn-Central case to the Commission, after the merger with the inclusion of the New Haven had been approved by the Commission and ap-

---

11. See Petition for Order No. 404, Printed Record, pp. 4443, 4449.

12. See Petition for Order No. 109, Printed Record, p. 927.

13. This contract was never brought before the Reorganization Court for approval or disapproval, but it furnished the basis for the Trustees' plan submitted to the Commission which adopted portions of it in formulating its own plan.

pealed,[14] Oscar Gruss and Son and the First Mortgage Bondholders Committee concluded that the operating losses of the New Haven were eating away the assets of the Railroad or building up superior liens on those assets to the point where their opportunity to recover something on their own bonds would best be realized by liquidation.[15] Even after the approval by the Supreme Court, on January 15, 1968, of the Penn-Central merger and the inclusion therein of the New Haven,[16] these bondholders continued to press their motion to liquidate. Their petitions were rejected by this court on February 13, 1968.[17] At that time the first step in the plan of reorganization had been approved by the Commission, although it had not been certified to the reorganization court. It was anticipated that review of the plan by a three-judge court and by this court, with any appeal to the Court of Appeals from this court's judgment, would be given high priority, and appeals to the Supreme Court from both cases would be docketed with the Supreme Court at the opening of the October, 1968 term. Accordingly, although it was clear that the liquidation value of the New Haven as of December 31, 1966 was being chiseled down day after day by the operating losses, there was an excellent prospect that the terms of the transfer and the amounts to be paid or assumed by the Penn-Central for the assets of the New Haven would soon be fully adjudicated.

As investors in railroad bonds, the petitioners were required in the public interest to suffer the burden of keeping the Railroad operational for a reasonable period to permit this to be accomplished.[18] As mentioned in the opinion denying the petition, it was unthinkable to terminate the reorganization proceedings, after a long and hazardous journey through a dark and seemingly endless tunnel just as light began to show at the far end.[19] Now the circumstances have changed very radically. Unfortunately the plan must be referred back to the Commission for further proceedings, which at best will probably and unavoidably be very time consuming. At the hearing on the plan Attorney Auerbach, speaking for the Trustees of the New Haven, stated that it would not be possible for judicial review proceedings to reach the Supreme Court before the October, 1969 term. This statement was neither contradicted nor challenged. The tunnel has lengthened and the light is no longer bright. Moreover, most serious of all is the fact that the New Haven Railroad no longer has the capability to reach the far end of the tunnel, and, as more fully discussed below, there is an urgent necessity that the New Haven be included in the Penn-Central at an early date. The following tables provide compelling evidence of the history and trend of the Railroad's financial plight and of the pending crisis.

14. Baltimore & O. R.R. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159 (1967).

15. See Answer of First Mortgage 4% Bondholders Committee to the Trustees' Petition for Instructions (Order No. 441) and Cross-Petition for Termination of Reorganization Proceedings, Printed Record 5087; Answer of Oscar Gruss & Son to Petition of the Trustees for Order No. 441, Printed Record 5121.

16. Penn Central Merger and N. & W. Inclusion Cases, supra, note 10.

17. Memorandum of Decision on Petition for Order No. 441; Cross-Petitions of First Mortgage Bondholders Committee and of Oscar Gruss & Son for Termination of Reorganization Proceedings, and Trustees' Motions to Dismiss the Cross-Petitions, Printed Record 5633.

18. See supra, note 10.

19. Printed Record pp. 5633, 5638.

In Appendix D of its report and order of November 16, 1967, the Commission set forth New Haven's deficits for the years 1961–1966 as follows:

The New York, New Haven and Hartford Railroad Company
condensed income statement for the years 1961–66

| Year | Net railway oper. deficit | Income (deficit) before fixed charges | Net Inc. (deficit) after fix. chgs. and other deducs. |
|---|---|---|---|
| 1961 | ($19,577,000) | ($11,952,000) | ($19,500,000) |
| 1962 | ( 11,514,000) | ( 5,083,000) [20] | ( 12,741,000) |
| 1963 | ( 10,090,000) | ( 4,884,000) | ( 12,264,000) |
| 1964 | ( 17,056,000) | ( 8,326,000) | ( 15,263,000) |
| 1965 | ( 16,008,000) | ( 8,422,000) | ( 15,063,000) |
| 1966 | ( 13,044,000) | ( 5,359,000) | ( 11,345,000) |

Comparable deficits for the period from December 31, 1966 through June 30, 1968 follow: [21]

| Year | Net railway oper. deficit | Income (deficit) before fixed charges | Net Inc. (deficit) after fix. chgs. and other deducs. |
|---|---|---|---|
| 1967 | ($20,179,000) | ($13,720,000) | ($19,514,000) |
| Six months ended June 30, 1968 | ( 12,190,000) | ( 8,494,000) | ( 11,420,000) |

The rate of cash loss for 1967 and the first seven months of 1968 follows:

| | 1967 | 1968 |
|---|---|---|
| January | ($ 997,000) | ($1,907,000) |
| February | ( 1,766,000) | ( 89,000) |
| March | 799,000 | ( 659,000) |
| April | ( 291,000) | ( 937,000) |
| May | ( 713,000) | ( 1,146,000) |
| June | ( 537,000) | ( 1,699,000) |
| July | ( 1,876,000) | ( 886,000) |
| August | 13,000 | |
| September | 517,000 | |
| October | ( 377,000) | |
| November | ( 296,000) | |
| December | 508,000 | |
| | ($5,016,000) | ($7,323,000) |

The New Haven's cash losses are now being made up out of borrowings under Order #480, dated December 19, 1967 in which this court authorized the Trustees to borrow up to $25,000,000 from the Penn-Central. The Trustees stated at the hearing on the reorganization plan that this amount would not carry the Railroad beyond June 1969—an estimate which is likely to prove optimistic. In any event, this court now concludes that such borrowing to carry the deficit operation beyond the end of 1968 is not justified. Order #480 is being modified accordingly. In addition, no funds now in the registry of the court, held in lieu of mortgaged property which has been sold, will be used to pay operating losses.

There remains, of course, the public interest in keeping the New Haven going, and the bondholders may be re-

20. Pennsylvania R.R.—Merger—New York Central R.R., 331 I.C.C. 643 (1967), Appendix D contains a typographical error showing this figure as 55,083,000.

21. Source—Rail Form A for the year ended December 31, 1967—The New York, New Haven and Hartford Railroad Company, and I.C.C. quarterly report Form IBS, 2nd quarter 1968.

quired to bear their share of the losses to December 31, 1968 subject to such loss sharing by Penn-Central as the Commission may direct, to afford the Commission an opportunity to consider and rule upon the issuance of an order to the Penn-Central physically to take over and commence operating the New Haven Railroad not later than January 1, 1969, leaving the price and the other terms of the inclusion to be determined later.[22]

If the Commission decides not to issue such an order this court will reluctantly be forced to entertain a motion to dismiss the reorganization proceedings. §§ 77 (e) and (g). While liquidation will have to await authority to abandon, the trains will stop in January because, with no money with which to pay employees, suppliers and materialmen, actual operation of the Railroad will cease.

■ The extent to which the constitutional minimum of value of property rights to which the bondholders are entitled (in this case the liquidation value as of December 31, 1966) may properly be invaded in the public interest to keep railroad operations going pending a solution of the problem of reorganization, is hardly a matter which can be determined with mathematical precision. It involves a consideration of the amount and nature of the Railroad's obligations, the seriousness of adverse consequences to the public if service were terminated, the rate of losses and the feasibility of possible solutions. In view of the history of this deficit operation from the time of the filing of the petition under § 77 and even before, the size of the losses, the long period of time necessarily involved in seeking to work out a solution, short of liquidation, through inclusion in the Penn-Central, the present condition of the Railroad and the rate of loss and out-flow of cash in the recent past and in the foreseeable future, this court finds that the continued erosion of the Debtor's estate from operational losses after the end of 1968 will clearly constitute a taking of the Debtor's property and consequently the interests of the bondholders, without just compensation. It is therefore constitutionally impermissible, and obviously no reorganization plan which calls for such a taking can be approved.

Two of the several cases cited elsewhere in the footnotes may usefully be summarized in support of this conclusion:

In Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 658, 677, 684, 685, 55 S.Ct. 595, 79 L.Ed. 1100 (1935), the Supreme Court sustained an order of the bankruptcy court enjoining creditors who held collateral notes from selling the collateral despite the possibility of a decline in its value during the period of restraint. Noting that the value of the collateral greatly exceeded the secured indebtedness and that the order contemplated only reasonable delay, the Court nevertheless suggested that the order would have to be reconsidered if injury to the creditors became irreparable through an unreasonably long delay in the proceedings before the bankruptcy court. See also In re Brown, 84 F.2d 433, 436 (7 Cir. 1936) (injunction against sale of collateral sustained, without prejudice to renewed application if the fact situation changes so that prejudice to the creditor is shown). In In re Third Ave. Transit Corp., 198 F.2d 703, 707 (2 Cir. 1952), the Court of Appeals reversed an order directing the first mortgage indenture trustee to turn over certain sums to the reorganization trustees in return for certificates of indebtedness bearing interest but without maturity date. The court declared that such involuntary loans could not be ordered unless there was a high degree of likelihood that the debtor could be reorganized within a reasonable time with no injury

22. Immediate inclusion has been sought by Oscar Gruss & Son since the latter part of 1966; and there is being considered in connection with the hearing on the Reorganization Plan, a motion by the State of Connecticut for immediate inclusion.

to the secured creditors who were being forced to advance the money. Acknowledging that the judge properly took into account the public interest in the debtor's continued operations, the court nevertheless advised that there are "strict limits to the extent to which, in reorganization proceedings, the interests of creditors * * * may be sacrificed to the public interest; to exceed those limits is (to say the least) to come dangerously close to the edge of unconstitutional taking of property, a line from which courts should keep away if possible."

There is presently no reason why the Penn-Central should not take over the New Haven at the beginning of 1969. The record of the merger and inclusion cases make it abundantly clear that the inclusion of the New Haven was an absolute and unequivocal condition of the approval of the merger of the Pennsylvania and New York Central Railroads, from the order of the Commission through the decision of the Supreme Court. In consummating the merger Penn-Central agreed to pay whatever price and submit to whatever terms for the inclusion that the Commission and the Courts might find reasonable. Counsel for Penn-Central in arguing the merger case before the Supreme Court, in response to questions from the bench, made this perfectly plain.

> "MR. COX: The order [in] which the Commission did this was an order made in the New Haven Inclusion Case and, of course, which can be and undoubtedly will be reviewed before the three-judge court in the usual way and as Mr. Auerbach points out, of course, it is upon that view that the Commission ordered.

> The Commission has to fix terms that are more onerous on the Penn-Central, the Penn-Central having consummated the merger as allowed to do in the meantime, would be bound by those conditions as a result of the Commission's original order."

\* \* \* \* \* \*

"MR. JUSTICE BRENNAN: I take it Penn-Central's judgment must be there are other values, even if it is a losing operation, a merger which makes the merger overall in their best interests; is that it?

MR. COX: The answer is yes. They won't be prepared to go forward with it unless—

MR. JUSTICE BRENNAN: As I understand it, whatever this arrangement is now, Penn-Central can't get out of it.

MR. COX: They can't get out of it if they consummate the merger.

MR. JUSTICE BRENNAN: If the merger is approved, it must go forward and whatever the result, Penn-Central will be stuck with it; is that it?

MR. COX: They would be stuck with it in this sense.

MR. JUSTICE BRENNAN: Suppose a review of this recent order of ICC, and it could happen, I expect, the Commission might be reversed, and they go back to the Commission for something else, something better perhaps, what is Penn-Central's position then?

MR. COX: I understand, having consummated the merger, of Penn-Central, you have two companies involved by that act to be bound by any conditions the Commission fixed originally or on remand, under Section 5(2) (d) of the Act, insofar as the New Haven is concerned. \* \* \* "

(Transcript pp. 136, 144–145).

No question remains in the case as to whether or not the Penn-Central has the obligation to include the New Haven. Any claim that this is an issue which the Commission may still pass upon and sustain or deny is untenable. The only related questions remaining are when and at what price. But the time of actual inclusion is not dependent upon the prior fixing of the price and the terms. In his separate opinion in the decision of the three-judge court, Judge

Weinfeld took the position that because the inclusion of the New Haven was a condition of the Penn-Central merger, the New Haven should have become a unit of the Penn-Central merger, "with the latter necessarily absorbing operating losses from the date of the merger." He recognized that, as a practical matter, actual inclusion coincidental with the merger would have been impossibly difficult. But the only reason for this was the complexity of putting together two of the largest trunk line railroads in the country to form the largest railway system in the world. This circumstance called for a postponement of the physical inclusion of the New Haven which carried with it sizeable problems of its own. The acute stage of welding the Pennsylvania and the New York Central systems into one operation is sufficiently advanced, however, so that the reason for delay in absorbing the New Haven no longer obtains. As this was largely for the benefit of the Penn-Central, the cogency of what Judge Weinfeld said is apparent.

It may well be argued that the Commission and the Courts, including the Supreme Court, by approving the merger conditioned upon the inclusion of the New Haven, placed the responsibility on the Penn-Central for bearing the losses in the public interest, and thereby relieved the bondholders of that obligation. It will, however, rest within the judgment of the Commission on remand to decide whether all or only a portion of the losses of the New Haven should fairly be borne by the Penn-Central for the period February 1 to December 31, 1968.

Before turning to specific items in the valuation it should be noted that the Commission was, indeed, faced with many novel and difficult problems. Some of the errors in the Commission's report were due undoubtedly to oversight, caused by the sheer complexity and quantity of the evidence and the claims relating to the factual and legal issues, as well as the formidable task of synthesizing them into findings and conclusions under the urgency and pressure of the shortest possible span of time. On the question of the Grand Central properties the Commission suffered from a paucity of evidence and legal sources for an interpretation of the claims of the parties in interest.

In any event, the court is keenly aware that it is easier from a more detached position to note errors in a plan than it is to formulate one in the first place. Most of the specific claims of error in the reorganization plan which necessitate its remand to the Commission are discussed in the excellent opinion by Judge Friendly, writing for the three-judge court. The reorganization court will, therefore, confine its discussion to matters which it wishes to enlarge upon, qualify or explore along somewhat different lines. There has already been discussed liquidation value as the proper standard, but no purpose would be served by traversing again all areas of agreement. The points not to be discussed, on which both courts are in agreement, however, will, for convenience, simply be identified as follows:

*Those concerning the valuation of the New Haven:*

(a) the Commission's failure to discount expenses of liquidation;

(b) the under valuation of $1.1 million of the New Haven's interest in the Boston & Providence R.R. Corporation;

(c) the refusal by the Commission to consider possible tax benefits to Penn-Central;

(d) the rejection of the testimony of bondholders' expert, Wyer, concerning the minimization of the expenses of liquidation as to portions of the Railroad's lines which might be taken over by other carriers; and

(e) the acceptance of the Commission's conclusions as to the value of passenger cars and of investments by the New Haven in Fruit Growers Ex-

press, New York Connecting R. R., Pullman Co., Railway Express Agency and certain affiliated lines; also the Commission's finding of values through "rounding off".

*Those concerning the value of the consideration to be received:*

(f) the Commission's failure to take into account that $16.2 million of the price may have to be expended to pay off prior tax liens in order that the properties may be sold free and clear of such liens;

(g) approval of the Commission's valuation of the Penn-Central stock at $87.50 per share, based upon its own calculation of the estimated future earning power of Penn-Central and upon the testimony of Trustee Kirk, a well qualified expert. There is no reason why recent fluctuations in the market value of these shares should change the disposition of the matter;

(h) the failure of the Commission to discount the Penn-Central bonds which Penn-Central had the option to use in satisfaction of its "Purchase Price Adjustment" provisions; and

(i) the necessity for re-examination by the Commission of bases for differences between its calculated liquidation value and the value of the consideration to be received from Penn-Central.

*Cost of acquisition to Penn-Central:*

(j) Commission's errors in valuation of 23 million principal amount of Penn-Central 5% bonds and assumption by Penn-Central of Boston & Providence mortgage as well as those used in Purchase Price Adjustments; and

(k) necessity for reconsideration of cost of assuming equipment obligations.

The Reorganization Court concurs in and adopts the reasoning, conclusions and the dispositions relating to the fore-going matters, made by the three-judge court, and concludes that they require the remand of the Commission's plan by the Reorganization Court.

It now turns to other subjects dealt with in the Commission's report which call for brief discussion.

1. *The New Haven's Interest in Grand Central Terminal (G.C.T.) Properties.*

The nature and extent of the legal interest of the New Haven Railroad in the G.C.T. properties constitutes the most important and most difficult problem in determining a fair valuation of the Debtor's assets. In the absence of a final adjudication of what those interests are, through a plenary suit in the courts of the State of New York, the Commission had to estimate the value of New Haven's claim. The Trustees of the Railroad did not go forward with a plenary suit because they had been advised by competent and experienced counsel that, on liquidation of the New Haven with none of its cars moving in and out of the Grand Central, the New Haven would have no interest in the G.C.T. properties, save for the repayment of certain building advances. In the light of this they felt it would be a dereliction of their duties to risk the tremendous expense and long delay of four to five years, during, which, because of New York Central's and later Penn-Central's opposition to treating the G.C.T. property claims as separate from the rest of the merger and inclusion, all proceedings would have been held up for a time longer than the New Haven could survive. The Commission in its report concluded that " * * * the claims of New Haven are not frivolous but claims of substance and, in the absence of litigating them, they must be deemed to be valuable."

The means adopted by the Commission to determine the extent and worth of the New Haven's claims, however, were altogether too imperfect to be sustained.

Part of the Commission's difficulty stemmed from its limited concept of the extent and nature of New Haven's interests in the properties. This court, as an aid to itself, in reviewing the fairness and equitability of the Commission's decision, appointed the Special Master to "make a legal appraisal of the interests and rights of the Debtor in said properties, including the nature of the Debtor's interest in the event of the cessation of passenger operations in the Grand Central Terminal." Judge Van Voorhis had just retired as a Judge of the Court of Appeals of the State of New York after a distinguished career on that and the two next highest courts of the State. His thorough and illuminating reports, filed with this court, in broad aspect cover two areas: the first is a description of the nature of the legal interests of the New Haven in the G.C.T. properties, which this court accepts, adopts and incorporates by reference as a part of this opinion; the second is a survey of the evidentiary terrain, disclosing the existence and availability of proof, on the basis of which dollar value may be computed. The purpose of the later was to discover whether there was anything beside a theoretical reason for remanding the Commission's plan. If, as a practical matter, full recognition of all of the legal interests the New Haven could properly claim would, at best, lead to no more than the 13 million dollars the Commission estimated to be the value of the claims, it would be a waste of time to remand on this issue. The purpose of the survey of the terrain was, therefore, strictly limited as an aid to this court in determining whether or not the value found by the I.C.C. was fair and equitable and it was in no sense intended to be a new finding of value, which lies in the sole province of the Commission. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 477, 63 S.Ct. 692, 87 L.Ed. 892 (1943).

The Special Master's reports show that there is evidence available to show a value considerably in excess of the Commission's appraisal of the claims, and it therefore must be concluded that the $13,000,000, found by the Commission, is neither fair nor equitable. The conclusions of the three-judge court are strikingly similar to those of the Special Master.

As the situation now stands, the Commission, the three-judge court, and this court have concluded that the New Haven has valuable rights in the G.C.T. properties that would survive the cessation of operations by the New Haven. While this consensus does not establish New Haven's rights with the same finality as an adjudication by the New York state courts would do, the Commission should proceed, as it did before, on the basis that the New Haven's rights are valuable. In appraising the value of the claims, the Commission may, of course, take into consideration the fact that there has been no such adjudication.

In addition, it is suggested that the Commission consider and make findings as to what value, if any, attaches to New Haven's present right to share in the income for the purpose of defraying its cost of operating in and out of the terminal. Whether an authority will take over New Haven's commuter operations and succeed to this right, which the New Haven now has, or Penn-Central succeeds to that right, a valuable interest will have been acquired. There is admittedly a certain element of speculation involved, and the Commission would, if it concludes that this present right has value, be justified in adopting a somewhat higher capitalization rate than 8%.

The only remaining comment concerns New Haven's 50% interest in the excess income in the Terminal Account and, that is, that the period considered should commence with the 1964 account and run to the time of New Haven's inclusion in Penn-Central.

### 2. *Harlem River and Oak Point Freight Yards.*

■ The three-judge court concluded that the Commission's report on the valuation of these properties did not adequately explain its basis for rejecting the higher of the two appraisals submitted on behalf of the Trustees or the appraisal for industrial use made by the bondholders' expert. It also raised the question whether or not the deductions from value made in the course of the appraisal which the Commission accepted was not duplicated by the deductions made by the Commission in its overall calculations. While a clarification of these matters is desirable, it appears to this court on the present record that there was substantial evidence to support the Commission's valuation and not enough to show that it was unfair or inequitable.

### 3. *Claim of the Trustee of the Harlem River Division Mortgage for Assumption.*

The three-judge court declined to pass upon this claim and left it to be dealt with by the Reorganization Court. The Harlem River mortgage is fully secured; it is relatively small in amount—$6,647,-000; it carries a low interest rate of 4½% and matures in January, 1973. The accrued and unpaid interest as of the end of 1968 will total approximately $2,260,000. It is reasonably certain that the consideration to be paid by Penn-Central to the New Haven will be increased by an amount in excess of the principal and accrued interest on the Harlem River mortgage. The present plan leaves the way open for the mortgagees to lose their lien and to be required to accept in its place security of less quality. This would damage the Harlem bondholders without contributing anything really necessary for the reorganization. Under the circumstances this would be unfair and inequitable. To prevent any undue burden falling on the Penn-Central in this regard, the Commission could provide for Penn-Central's assumption of the mortgage subject to some possible modifications. For example, if Penn-Central's inclusion of the New Haven takes place on January 1, 1969, it could then assume the Harlem River mortgage, subject to such qualifications in its favor as elimination of any sinking fund requirements and an option to pay the accrued interest in four or five installments over the remaining life of the mortgage.

### 4. *Loss Sharing Formula*

The three-judge court's opinion dealt with this subject in detail and concluded that the formula was improper because the provision for the downward percentage of Penn-Central's share of losses over the three ensuing years was designed to curtail litigation by the bondholders. The reorganization court must take general responsibility for suggesting this kind of provision. It has been recognized by most courts, including the Supreme Court, that litigation may be used not only for the fair determination of disputed claims but as a tactical or strategic weapon in itself. In this case the measure may have reflected an ill-founded fear on the part of the court. It is certainly true that Penn-Central could equally well seize an opportunity to delay and any necessary steps designed to prevent that kind of thing should apply to all of the parties. This should in no way reflect on counsel for any of the parties whose decorous advocacy and outstanding professional skill have been manifest throughout. The issues raised both before the three-judge court and before this court have become almost academic in view of the necessity for the inclusion of the New Haven in Penn-Central by January 1, 1969. The Commission must decide whether to order such inclusion and what share of the losses from February 1, 1968, the date of the merger, to the end of 1968 should be borne by Penn-Central. This court is of the opinion that, as mentioned above, it should be a substantial percentage.

Present circumstances also render academic the claim that the Commission should prescribe Appendix G type conditions for the protection of the New Haven.

### 5. *The Providence-Worcester*

The Commission reserved jurisdiction to pass upon Providence & Worcester's requests arising out of amendment #1 to the New Haven's plan of reorganization rejecting the lease with that road. Counsel for Providence & Worcester appeared at the hearing held by this court and asked the court to order the Commission to require the assumption of the lease by Penn-Central at the time of the inclusion. But no reason was given which persuaded the court to interfere with the Commission's reservation of jurisdiction or the Commission's discretion to pass upon the issue at a later time.

### 6. *Effect of Correction of Errors in Consideration to be Paid.*

The flexibility left to the Commission in its consideration on remand of the matters discussed in the opinion of this court and that of the three-judge court will result in an addition to the consideration to be paid by Penn-Central to the New Haven under the terms of the Commission's plan now on review in an amount which may properly fall within a range of $33,000,000 to $55,000,000. It is the present opinion of the court that amounts below this range would be unfair and inequitable to the creditors and an amount in excess of this range would appear to be unfair and inequitable to Penn-Central.

Other points raised by the parties, such as Penn-Central's argument that these proceedings cannot be held to be in effect a condemnation and the bondholders' claim that the Commission erred in basing its plan in large part on the Trustees' plan which closely followed the terms of the inclusion agreement between the New Haven Trustees and the Pennsylvania and New York Central Railroads, require no discussion. The Trustees' plan has not been reduced to little or no significance by the action taken by the reviewing courts. On the contrary, it still furnishes a sound, constructive and proper nucleus for the Commission's disposition of the case on remand. What it needs is supplementation rather than repudiation.

The three-judge court found that the total cost of acquisition of the New Haven to Penn-Central will be something in excess of $250 million. Judge Friendly reached this amount by capitalizing at 8% estimated future annual losses of 8.5 million, which added $106 million to other items of cost. Judge Weinfeld, however, disagreed with the addition of this sum, and Judge Levet felt that consideration of the subject of cost to Penn-Central was unnecessary under the theory adopted by the Commission. Judge Friendly went a long way toward eliminating the significance of the addition made to cost by pointing out that, even after allowing for New Haven losses, Penn-Central would ultimately save $72.5 million dollars per annum which capitalizes at $900 million.

Once it is decided that the New Haven creditors have contributed in losses all they can constitutionally be required to dedicate to the public interest, the responsibility for future losses becomes an issue between the Commission and Penn-Central. As the bondholders point out, it is the Commission which is compelling the continued operation of the heavily deficit ridden passenger services and losing freight operations. The creditors cannot very well be faulted or penalized for this. Surely it is not contemplated that Penn-Central is immune from assuming, in the public interest, operational losses of the New Haven. The whole purpose of making the inclusion of the New Haven a condition of the merger was to require Penn-Central, which, in being permitted to merge, was granted the opportunity to realize tremendous economic benefits, to take over and operate a helplessly sick but still needed railroad, which it could well afford to do. It is part of the price Penn-Central is called upon to pay for

the right to merge. The right to merge was granted, the merger has taken place, and the price should be paid.

"Continuation of the operation of the NH, which the Commission has found to be essential, can be assured only upon and after effectuation of the merger of the Penn-Central. The bondholders agree that to delay the Penn-Central merger until all proceedings necessary to include the NH have taken place may well mean the end of NH operations. The only realistic way to avoid this is to permit prompt consummation of the Penn-Central merger subject to appropriate conditions respecting the New Haven which Penn-Central will perforce accept by its act of merger. * * * "

Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 510, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968).

In conclusion this court proposes that the Commission consider first the matter of the inclusion order and with it a partial payment of the purchase price.

In its order of November 16, 1967, the Commission found the consideration agreed to between the Trustees and the merging railroads fair; both the three-judge court and this court have concluded that the consideration was too low. While the upward adjustment remains to be determined, the Commission could properly provide for a partial payment with an order for inclusion to take effect January 1, 1969. For example, it could appropriately require Penn-Central to deliver 950,000 shares of its stock, $23,000,000 principal amount of its 5% bonds and pay $8,000,000 in cash. It is also suggested that the matters of early inclusion and partial payments, which are extremely urgent and severable from the other issues in the case, be considered first and as expeditiously as possible.

The case is referred back to the Commission for further proceedings including the modification of the plan in accordance with this opinion.