In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.

Nos. 690, 691, Dockets 71-2101, 72-1009.

United States Court of Appeals, Second Circuit.

Argued April 23, 1973.

Decided May 10, 1973.

Manny H. Smith, Atty., I. C. C., Washington, D. C. (Harlington Wood, Jr., Asst. Atty. Gen., Irwin Goldbloom,

Sp. Litigation Counsel, James F. Dausch, Atty., Dept. of Justice, Washington, D. C., Fritz R. Kahn, Gen. Counsel, Leonard S. Goodman, Associate Gen. Counsel, I. C. C., Washington, D. C., on the brief), for appellants United States and Interstate Commerce Comm.

Joseph Auerbach, Boston, Mass. (James Wm. Moore, Joseph W. Bishop, Jr., New Haven, Conn., Sullivan & Worcester, Nancy F. Gans, Boston, Mass., on the brief), for appellee Richard Joyce Smith, Trustee of the Property of the New York, New Haven & Hartford Railroad Co., Debtor.

Before BREITENSTEIN,* KAUFMAN and MANSFIELD, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This appeal involves a skirmish in the larger and seemingly endless battle of the bankrupt New York, New Haven and Hartford Railroad ("New Haven") and the bankrupt Penn Central Transportation Co. ("Penn Central") to achieve a workable long-term solution to their financial problems. We are asked to enter the fray and interpret § 77(c)(2) of the Bankruptcy Act, 11 U.S.C. § 205(c)(2), which provides, in pertinent part, that the "trustees [appointed by the district court under § 77(c)(1) to administer the railroad's affairs] and their counsel shall receive only such compensation from the estate of the debtor as the judge may from time to time allow within such maximum limits as may be approved by the [Interstate Commerce] Commission."[1] Our intervention is sought in the context of an appeal from two orders of Judge Anderson, sitting in the District Court for the District of Connecticut, who was ably supervised the current New Haven reorganization proceedings since their inception in July, 1961. In Order No. 652, entered on August 30, 1971, Judge Anderson awarded to Foster Kent Sistare, Esq., $8,425.00 as compensation for services rendered and $3,144.40 for expenses. Sistare previously had been appointed by the court as "court's counsel" to perfect an equitable lien and constructive trust declared by Judge Anderson upon New Haven assets transferred to the Penn Central. The payment was ordered without prior submission of the claim to the Commission. Order No. 656, entered on November 9, 1971, concerned a claim, unrelated to the claim presented by Sistare, filed by Tate & Ervin,[2] a Philadelphia law firm, in connection with services performed as a Special Counsel to the New Haven trustee. Although Judge Anderson referred to the Commission Tate & Ervin's request for $4,646.00 compensation, he allowed, without referral, payment of $2,055.28 for disbursements.

The Commission appealed from both orders. It argues here that under § 77(c)(2) of the Bankruptcy Act, any payments to these attorneys out of the debtor's estate that have not been submitted to the Commission are invalid. The New Haven trustee asserts, however, that § 77(c)(2) cannot control payments to Sistare—for either compensation or disbursements—because he is neither one of the "trustees" nor "their counsel". As for the expense claims of Tate & Ervin, it is the trustee's position that the term "compensation" as used in § 77(c)(2) does not include disbursements and, accordingly, § 77(c)(2) does not govern the award of expenses to that firm. As to Sistare, we agree with the trustee that no prior submission to the Commission was required because

---

* United States Court of Appeals, Tenth Circuit, sitting by designation.

1. This procedure is designed to take advantage of the Commission's expertise in railroad reorganization matters by having it set a maximum amount of compensation which is fair and reasonable in light of the work involved. *See* 5 Collier, Bankruptcy ¶ 77.28.

2. The firm's present name is Gratz, Tate, Spiegel, Ervin & Ruthrauff. We refer to it throughout this opinion as Tate & Ervin.

Sistare was not counsel to the trustee. Accordingly, Order No. 652 is affirmed. We were informed at oral argument, however, that all disbursement claims of Tate & Ervin, including the claim that is the subject of this appeal, have been submitted voluntarily to the Commission. In light of this development, we conclude that the appeal from Order No. 656 should be dismissed for mootness.

### I.

A discussion of the New Haven reorganization proceedings, especially their relationship to the ill-starred merger of the Pennsylvania Railroad and the New York Central Railroad, will prove helpful in placing the orders under consideration in their proper context.

Prior to its inclusion in the Penn Central system, the New Haven was the largest railroad in New England and the sixth largest in the Northeast region. New Haven Inclusion Cases, 399 U.S. 392, 401, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). In addition to a crucial role as a commuter line, most particularly in the New York City area, "its freight service [was] considered to be of extreme importance to the industrial well-being of southern New England." New York, N. H. & H. R. R. Trustees Discontinuance of Passenger Service, 327 I.C.C. 77, 80 (1965). Despite its importance, however, "[t]he financial history of the New Haven . . . for decades [has been] a history of extreme vicissitudes," 399 U.S. at 402, 90 S.Ct. at 2063. To its dismay, the railroad is no stranger to the Bankruptcy Court. The New Haven first filed a petition for reorganization in 1935 and did not emerge from those proceedings until 1947. Although all but the most senior secured interests were eliminated during this reorganization, the New Haven was still unable to operate as a viable enterprise. By 1961, the railroad's monthly cash deficit approached $1.5 million and on July 7, 1961, its management again filed a petition for reorganization under § 77 of the Bankruptcy Act. The Connecticut district court approved the peti-

tion and trustees were appointed to administer the failing railroad.

During succeeding years, the court appointed trustees continued to operate the New Haven's passenger and freight lines despite staggering losses. Since the previous decade had demonstrated convincingly that the New Haven's traffic patterns could not generate sufficient revenues to meet its costs, no serious consideration was ever given to a reorganization plan that left the New Haven as an independent operating enterprise. Instead, the trustees concentrated their efforts on seeking a merger with a larger, financially healthy railroad. The eagerly hoped for panacea soon appeared when, in March, 1962, the Pennsylvania Railroad and the New York Central Railroad formally sought merger approval from the Commission. Within three months, the New Haven trustees filed a petition with the Commission seeking inclusion of the New Haven's operations in the merged railroad system.

On April 6, 1966, after more than four years of continued deficit operations by the New Haven, the Commission approved the proposed merger, subject to the condition that the "Pennsylvania New York Central Transportation Company . . . be required to include in the transaction all the New York, New Haven and Hartford Railroad Company . . . upon such fair and equitable terms as the parties may agree subject to the approval of the Bankruptcy Court and the Commission." Pennsylvania R. R.—Merger—New York Central R. R., 327 I.C.C. 475, 553 (1966), modified in other respects, 330 I.C.C. 328, aff'd sub nom., Erie-Lackawanna R. R. v. United States, 279 F. Supp. 316 (S.D.N.Y.1967), aff'd sub nom., Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). After the Commission's decision was filed, the New Haven trustees and the Pennsylvania and New York Central Railroads submitted to the Commission a Purchase Agreement which contemplated an ex-

change of all of the New Haven's assets for cash and securities of the Penn Central. Upon receipt of the Purchase Agreement, the Commission conducted an independent review and concluded that $125 million was a "fair and equitable" price for New Haven's assets. Pennsylvania R. R.—Merger—New York Central R. R., 331 I.C.C. 643 (1967). Almost immediately thereafter, different classes of New Haven bondholders challenged the Commission's evaluation. Review was sought simultaneously in a three-judge district court in the Southern District of New York, pursuant to 28 U.S.C. § 2325,[3] and in the Connecticut district court. Both courts independently concluded that $125 million was an inadequate price and remanded to the Commission for further proceedings. New York, N. H. & H. R. R. Co., First Mortgage 4% Bondholders' Committee v. United States, 289 F.Supp. 418 (S.D.N.Y.1968); In the Matter of New York, N. H. & H. R. R. Co., 289 F.Supp. 451 (D.Conn.1968).

The Commission then proceeded to hold further hearings. On December 2, 1968, it announced a reevaluation of New Haven's assets at $140 million. New Haven bondholders again challenged the Commission's evaluation in both district courts.

By this time, however, New Haven's financial condition had become so desperate that despite a compelling public need for its services, train operations could no longer be continued under these circumstances. Accordingly, on December 24, 1968, Judge Anderson authorized immediate transfer of all New Haven assets to Penn Central, "leaving the exact amount and form of consideration to be paid by Penn Central to be settled finally at a later date." In the Matter of New York, N. H. & H. R. R. Co., 457 F. 2d 683, 685 (2d Cir. 1972). Thus, New Haven's only remaining "asset" is its right to receive "fair and equitable" compensation from Penn Central.

The second round of proceedings brought by objecting bondholders in the two district courts was concluded in mid-1969. In May of that year, the Connecticut district court again rejected the Commission's evaluation as too low, finding that a more accurate asset value was approximately $175 million. In the Matter of New York, N. H. & H. R. R. Co., 304 F.Supp. 793 (D.Conn.1969). The three-judge district court, however, approved the Commission's revised evaluation. New York, N. H. & H. R. R. Co., First Mortgage 4% Bondholders' Committee v. United States, 305 F.Supp. 1049 (S.D.N.Y.1969). Since a direct appeal to the Supreme Court of the three-judge court's decision was taken under 28 U.S.C. § 1253, the Supreme Court granted certiorari to the Court of Appeals for the Second Circuit in advance of its judgment on an appeal taken from the decision of the Connecticut district court so that both cases could be heard together. 28 U.S.C. §§ 1254(1), 2101(e).

The Supreme Court's decision, handed down on June 29, 1970, affirmed Judge Anderson's evaluation of the New Haven assets. New Haven Inclusion Cases, *supra*. Unfortunately, the Court's decision did not terminate the dispute. Only eight days prior to the Supreme Court's decision, the mighty Penn Central filed its petition for reorganization under § 77 of the Bankruptcy Act in the District Court for the Eastern District of Pennsylvania. Since Penn Central securities, which overnight became virtually worthless, were to comprise a significant portion of the payment to the New Haven estate, the Supreme Court remanded the case for "[f]urther proceedings before the Commission and the appropriate federal courts . . . to determine the form that Penn Central's consideration

3. This statute provides that "[a]n . . . injunction restraining the enforcement, operation or execution . . . of any order of [the Commission] shall not be granted unless the application therefor is heard and determined by a district court of three judges. . . ."

to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." 399 U.S. at 489, 90 S.Ct. at 2108.

Upon remand, Judge Anderson determined that the Penn Central's bankruptcy, and the attendant decline in value of its securities, rendered the earlier plan for compensation to the New Haven estate wholly inadequate. Moreover, the Penn Central's hopeless financial condition indicated that its general creditors would emerge from the Penn Central reorganization proceedings empty-handed. Judge Anderson, therefore, sought to give the New Haven estate secured-creditor status by declaring "an equitable lien . . . on all of the former assets transferred by the New Haven to Penn Central, exclusive of (a) rolling stock and (b) the New Haven's one-half interest in the excess income from the Grand Central [Terminal] properties" and, as to "the latter item of property . . . [by declaring] a constructive trust in favor of the New Haven estate." In the Matter of New York, N. H. & H. R. R. Co., 330 F.Supp. 131, 142 (D. Conn.1971).

This order provoked immediate action by Judge Fullam of the Eastern District of Pennsylvania, who was overseeing reorganization of the Penn Central. Believing that Judge Anderson lacked jurisdiction to enter an order affecting Penn Central assets, Judge Fullam enjoined any person "from taking any action which would enforce, collect, or cause to be perfected or paid any claim against the [Penn Central] or its estate arising out of the inclusion of the New Haven into the [Penn Central], other than in these proceedings, or which would interfere with the primary jurisdiction of this Court to deal with prop-

erties in its possession or under its control . . . ."

On June 22, 1971, Judge Anderson responded with the following order:

For the purpose of implementing this court's Order [imposing an equitable lien and a constructive trust on assets formerly owned by the New Haven], this court, on its own motion, appoints Foster Kent Sistare, Esquire, as the court's counsel to take such steps . . . as he may deem necessary or appropriate to preserve the equitable lien and constructive trust declared by this court . . . .

Sistare then made appropriate filings in Massachusetts, Rhode Island, Connecticut, and New York to record the equitable lien on assets formerly owned by New Haven and now held by the Penn Central.

The Penn Central trustees, however, who had appeared before Judge Anderson to object to entry of the equitable lien order, appealed that order to this court. On March 17, 1972, we reversed Judge Anderson, holding that he lacked subject matter jurisdiction to issue the order.[4] In the Matter of New York, N. H. & H. R. R. Co., 457 F.2d 683 (2d Cir. 1972). Recognizing that the Commission is a "common denominator" between the Connecticut and Pennsylvania district courts, the case was remanded to the Commission to "consolidate the Penn Central reorganization and New Haven inclusion proceedings so as to consider the terms of the New Haven inclusion as 'a portion of the reorganization of Penn Central . . . .'" Id. at 691.

Thus, at the present time, the New Haven estate is a shell, awaiting determination in the Penn Central reorganization of the amount and form of compensation it will receive as payment for

---

4. Section 77(a) of the Bankruptcy Act provides that the district court in which a petition for reorganization is filed "shall, during the pendency of the proceedings . . . have exclusive jurisdiction of the debtor and its property wherever located." We held that this provision gave the Pennsylvania district court "ex-

clusive jurisdiction . . . to determine all rights and interests in all of Penn Central's property, including the former property of the New Haven." 457 F.2d at 687. The Commission does not argue that this reversal made Judge Anderson's appointment of Sistare wholly invalid.

the assets earlier transferred to the Penn Central. Having set forth this history, essential for a complete understanding of the context in which we decide this case, we now turn to consideration of the two orders before us.

## II.

The claim for compensation and reimbursement filed by Sistare on August 26, 1971, detailed the expenditures in time and money made in an effort to perfect the equitable lien, described earlier, fixed by Judge Anderson. It sought compensation of $8425.00 for services performed by Sistare and his associates between June 23 and July 15, 1971.[5] In addition, Sistare sought reimbursement of itemized expenses totalling $3,144.40. More than $1,200 of this sum represented actual recording fees and travel expenses incurred by Sistare; the balance consisted of payments by Sistare to other attorneys retained by him to assist in the recording procedures.

The Commission contends that Judge Anderson erred in refusing to initially refer Sistare's claim to it for determination of maximum limits. It seeks to rely on either § 77(c)(2), previously quoted, which gives the Commission authority to set a ceiling on compensation of trustees and their counsel, or, in the alternative, on § 77(c)(12), which provides, in part, that "[w]ithin such maximum limits as are fixed by the Commission, the judge may make an allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders . . . ."

■ A consideration of the precise statutory language as it applies to the instant facts demonstrates the error of the Commission's argument. As Judge Anderson made abundantly clear during a hearing held on November 9, 1971, he appointed Sistare "in order to prevent a judgment of this Court from being turned into an utter futility . . . . It had nothing to do with the [New Haven] Trustee. The Trustee didn't have a thing to do with it. This was entirely the Court's action." Indeed, the Commission concedes that in light of Judge Fullam's order, "it would have been improper for the New Haven trustee to have himself attempted to record the lien or to have retained counsel to perform that task." Since Sistare was not counsel to the trustee, the Commission cannot assert authority over his compensation under § 77(c)(2) merely because his appointment was triggered by the trustee's inability to undertake this task or because perfecting the equitable lien may have benefitted the New Haven estate.

Similarly, § 77(c)(12) does not provide the Commission with jurisdiction over payments to Sistare for compensation and disbursements. Since Sistare was appointed by Judge Anderson as "court's counsel," § 77(c)(12) would apply only if we reached the extraordinary conclusion that Judge Anderson is either a party in interest or a reorganization manager, a suggestion we reject as totally devoid of merit.

The Commission urges us, however, to give an expansive reading to either § 77(c)(2) or § 77(c)(12) in order to maximize its powers to review payments made in connection with a reorganization proceeding. We recognize that Congress, in granting the Commission authority to establish payment ceilings, sought "to restrain the former practices common to equity receiverships by which exorbitant fees were obtained by the reorganizers." 5 Collier, Bankruptcy ¶ 77.28 at 591. But we do not believe that this legislative purpose dictates a stretching of carefully constructed language in this concededly *sui generis* situation. Certainly the district court

5. The claim stated that the attorneys had spent 168.5 hours performing this work, and sought compensation at the rate of $50.00 per hour.

does not require the Commission's assistance in passing upon Sistare's modest claims. Indeed, if Congress intended to indicate a belief that courts lacked the competence of the Commission to pass on compensation in any circumstances, it hardly would have authorized, as it has, judicial allowance of compensation for a special master appointed under § 77(c)(13) without prior submission to the Commission for establishment of maximum limits. We conclude, therefore, that since Sistare does not fall within the confines of §§ 77(c)(2) or 77(c)(12), submission of his claim for compensation and disbursements to the Commission was not required.

### III.

The Commission has appealed as well from Judge Anderson's refusal to refer to it for approval Tate & Ervin's claim for expenses in the amount of $2,055.28. Since the fortunes of the New Haven were so tightly linked to the Penn Central reorganization, Judge Anderson authorized the New Haven trustee to "intervene generally in the proceedings for reorganization of Penn Central" and "to employ local counsel in Pennsylvania that can represent [the trustee] before the United States District Court for the Eastern District of Pennsylvania . . . ." Tate & Ervin were retained to perform these services. Since the firm was counsel to the New Haven trustee, its claim for hourly compensation has been submitted to the Commission. The dispute centers, therefore, on whether the reference in § 77(c)(2) to "compensation" includes out-of-pocket disbursements, such as travel expenses, telephone charges, and duplication costs, or is limited solely to payments for an attorney's services.

The Commission urges us to construe the term "compensation" to include disbursements in order to preclude the possibility that attorneys may be paid twice for the same item of expense. Such overlapping is theoretically possible because in setting maximum limits for hourly compensation, the Commission includes an allowance for general overhead expenses, such as rent and secretarial salaries, involved in operating a law office. If attorneys are allowed to present their expense claims to the district court without prior submission to the Commission, it is conceivable, the Commission argues, that the district court might allow payment of some expenses already approved by the Commission in computing hourly compensation.

The trustee, in response, points to a provision in § 77(c)(12) which allows payment from the debtor's estate, within limits set by the Commission, "for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures . . . ." It is urged that this clause demonstrates Congressional awareness of the distinction between hourly compensation and expenses; therefore, the limited reference in § 77(c)(2) to "compensation" compels the conclusion that disbursements are not included within the meaning of that term. In addition, the Commission concedes that in an earlier decision involving the law firm of Sullivan & Worcester, also counsel to the New Haven trustee, it did not require prior submission of disbursement claims. New York, N. H. & H. R. R., 312 I.C.C. 697, 700 (1962). Finally, we note that even after maximum limits have been approved by the Commission, claims are still subject to allowance by the district court, which then could eliminate any overlapping amounts in the payments.

Although the Commission urges us to reach a determination on the merits of this part of the dispute, we are unable to do so, given the present posture of the appeal. As noted in our reference to the *Sullivan & Worcester* case, *supra*, the Commission's current position represents a turnabout from its earlier approach. Indeed, the November 9, 1971, hearing before Judge Anderson appears

to be the first occasion at which the trustee was apprised of the Commission's view.[6] In light of the Commission's new policy on submission of disbursement claims, Tate & Ervin not only has submitted all subsequent disbursement claims to the Commission, but by letter dated February 8, 1972, the firm voluntarily submitted the disbursement claims which are the subject of the instant appeal to the Commission "for the fixing of maximum limits thereon."

 Counsel's obvious willingness to submit their claims to the Commission effectively eliminates any controversy between the parties as to the correct interpretation of the term "compensation" in § 77(c)(2), since the Commission may now exercise the reviewing authority it has sought to establish in this proceeding. Thus, the facts "demonstrate that 'there is no reasonable expectation . . . .'", United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), *quoting from* United States v. Aluminum Co. of America, 148 F.2d 416, 448 (2d Cir. 1945), that Tate & Ervin subsequently will refuse to submit its disbursement claims to the Commission. The appeal, therefore, has become moot. *See* Gray v. Board of Trustees of the University of Tennessee, 342 U.S. 517, 72 S.Ct. 432, 96 L.Ed. 540 (1952); Watkins v. Chicago Housing Authority, 406 F.2d 1234 (7th Cir. 1969); Greater Houston Chapter of the American Civil Liberties Union v. Houston Independent School District, 391 F.2d 599 (5th Cir. 1968); 6A Moore, Federal Practice ¶ 57.13. Moreover, we do not deem it appropriate to render an advisory opinion simply because a similar question may arise in the future. Accordingly, the appeal

from Judge Anderson's refusal to direct that Tate & Ervin's disbursement claims be referred to the Commission is dismissed as moot.

---

6. After counsel for the Commission, Mr. Dausch, had concluded his argument, counsel for the trustee stated:

Mr. Moore: Your Honor, I had wanted to clear up two things. But the last statement by Mr. Dausch may remove one of them.

I did not realize that the Commission had ever contended that it had jurisdiction to approve the costs and expenses.

Sullivan & Worcester have from the very beginning submitted the matter of compensation to the Commission. . . . But the costs and expenses have never been handled by the Commission.

But is that the position you are now contending for, sir?

Mr. Dausch: Yes, sir.