In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Debtor.

Lawrence W. IANNOTTI, Successor Indenture Trustee Under the New York, New Haven and Hartford Railroad Company's First and Refunding Mortgage Dated as of July 1, 1947; and Jacob D. Zeldes, Successor Indenture Trustee Under the New York, New Haven and Hartford Railroad Company's General Income Mortgage Dated as of July 1, 1947, Appellants,

v.

MANUFACTURERS HANOVER TRUST COMPANY, former Indenture Trustee Under the New York, New Haven and Hartford Railroad Company's First and Refunding Mortgage Dated as of July 1, 1947; and Richard Joyce Smith, Trustee of the Property of the New York, New Haven and Hartford Railroad Company, Debtor, Appellees.

Nos. 399, 725, 726, Dockets 76–5025, 76–5033, 76–5037.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1977.

Decided March 18, 1977.

Certiorari Denied Oct. 3, 1977.

See 98 S.Ct. 120.

Irving S. Schloss, New Haven, Conn. (Lawrence W. Iannotti, and Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., on the brief), for appellant Iannotti.

Jacob D. Zeldes, Bridgeport, Conn. (Elaine S. Amendola, and Zeldes, Needle & Cooper, Bridgeport, Conn., on the brief), for appellant Zeldes.

Whitney North Seymour, New York City (Albert X. Bader, Jr., William K. Blomquist, Paul R. Gupta, and Simpson Thacher & Bartlett, New York City, on the brief), for appellee Manufacturers Hanover Trust Co.

James William Moore, New Haven, Conn., for appellee Richard Joyce Smith, Trustee of The New York, New Haven and Hartford Railroad Company, Debtor.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

This is the case of the wise and comprehending chancellor.

The case comes to us on cross-appeals by two successor indenture trustees from so much of a judgment of June 30, 1976, entered upon an opinion and order of the same date in the United States District Court for the District of Connecticut (the New Haven reorganization court), Robert P. Anderson, *Circuit Judge,* sitting by designation, 421 F.Supp. 249 (D.Conn.1976), as allowed to a former indenture trustee, Manufacturers Hanover Trust Company, compensation in amount of $304,416.67 and expenses in amount of $103,018.34, and to its counsel, Simpson Thacher & Bartlett, attorneys fees in amount of $808,000 and expenses in amount of $15,234.81.

The essential questions presented are (1) whether the New Haven reorganization court as a court of equity had the authority, absent a specific statutory directive to the contrary, in the exercise of its discretion to allow or to deny compensation and expenses, including attorneys' fees, to an indenture trustee which concededly represented conflicting interests under very unusual circumstances; and (2) if so, whether the reorganization court exercised sound discretion in allowing the compensation and expenses in question.

We hold that the reorganization court did have such authority; that on the unique facts of this case it did exercise its discretion soundly; and that it reached a fair and equitable result in allowing the compensation and expenses in question. We affirm.

I.

The conflict of interest that lies at the heart of this case arose out of the complexities of two mergers and two reorganizations. The companies involved, as now known, are the Manufacturers Hanover Trust Company (Manufacturers); the New York, New Haven and Hartford Railroad Company (New Haven); and the Penn Central Transportation Company (Penn Central). A brief narrative of how these companies reached their present status is necessary to an understanding of the instant controversy.

On July 7, 1961 the New Haven filed its petition for reorganization under § 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1970), in the United States District Court for the District of Connecticut. Since 1947 the Manufacturers Trust Company (Trust Company), a predecessor of the present Manufacturers, had been the corporate indenture trustee of the New Haven's first and refunding mortgage.[1] The Trust Company intervened in the New Haven reorganization through its general counsel, Simpson Thacher & Bartlett (Simpson Thacher), which had represented the Trust Company in its capacity as corporate indenture trustee since 1947. Judge Anderson, who in 1961 was Chief Judge of the District Court for the District of Connecticut, has presided over all proceedings in the New Haven reorganization continuously from their inception to date—a period of nearly 16 years.

On March 9, 1962 the Pennsylvania Railroad Company and the New York Central Railroad Company first proposed the merger that ultimately led to the organization of the Penn Central in February 1968. The New Haven reorganization trustees sought inclusion of the New Haven in the merged railroad, primarily under § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (1970), both by private negotiations with the merging railroads and by a petition filed with the Commission on June 26, 1962. The Commission approved the Penn Central merger on April 6, 1966 on the condition that the merged railroad would purchase the New Haven's assets. An agreement (inclusion agreement) was reached on April 21, 1966, between the New Haven trustees and the Pennsylvania and New York Central railroads, to include the New Haven in the Pennsylvania/New York Central merg-

---

1. Until July 1971 there was also an individual trustee, A. Frederick Keuthen, an officer of the Trust Company.

er. The agreement provided that the Penn Central would acquire the major part of the New Haven's assets for a consideration consisting of cash, bonds, Penn Central stock, and the assumption of certain of the New Haven's obligations. See generally *New Haven Inclusion Cases,* 399 U.S. 392, 408–410 (1970). The New Haven trustees bound themselves to support the agreement and the fairness of the proposed purchase price of approximately $125,000,000 for the New Haven's assets. Unlike the New Haven trustees, however, representatives of the New Haven's bondholders remained free to seek a higher price.

On October 24, 1966 the New Haven reorganization court authorized presentation of the agreement to the Commission which approved the agreement on November 16, 1967. *Id.* at 411–12. A final price had not been determined at that time, but on December 24, 1968, as we later noted, "because of the precarious financial condition of the New Haven and the imminent termination of its rail service, the [New Haven reorganization court] approved the transfer of New Haven's assets to Penn Central, leaving the exact amount and form of consideration to be paid by Penn Central to be settled finally at a later date." *In re New York, N.H. & H.R.R.,* 457 F.2d 683, 685 (2 Cir.), *cert. denied,* 409 U.S. 890 (1972). The Commission ultimately set the purchase price for the New Haven's assets at about $140 million, having previously concluded that the $125 million purchase price agreed to by the Penn Central and the New Haven trustees was "fair and equitable."[2] In the *New Haven Inclusion Cases, supra,* the Supreme Court held that the $140 million purchase price approved by the Commission was grossly inadequate and itself set the price at $174.6 million.[3]

On June 21, 1970, just eight days before the Supreme Court's decision in the *New Haven Inclusion Cases,* the Penn Central filed a petition for reorganization in the Eastern District of Pennsylvania. Penn Central securities became virtually worthless overnight. As we later observed, since Penn Central securities "were to [have] comprise[d] a significant portion of the payment to the New Haven estate, the Supreme Court remanded the case for '[f]urther proceedings before the Commission and the appropriate federal courts . . . to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central.' 399 U.S. at 489 . . . ." *In re New York, N.H. & H.R.R.,* 479 F.2d 8, 11–12 (2 Cir. 1973).

The inclusion of the New Haven's assets in the merged and later bankrupt Penn Central would not have resulted in the conflict of interest with which we are here concerned had there not been still another merger—a nonrailroad one. Backing up for a moment, in September 1961, two months after the New Haven filed for reorganization but before any of the other developments described above, Manufacturers Trust Company merged with The Hanover Bank (Hanover), to form the present Manufacturers Hanover Trust Company. Hanover had served as trustee under mortgages of the New York Central since 1897. When Hanover merged with the Trust Company, the merged bank's trust department inherited those mortgages. The law firm then known as Kelley, Drye, Newhall, Maginnes & Warren (Kelley, Drye), Hanover's counsel, continued to handle the legal work of the merged bank's corporate trust department. Since Simpson Thacher had represented the Trust Company as corporate indenture trustee of the New Haven's first

---

**2.** It was only after New Haven's bondholders successfully challenged the Commission in two separate suits, *In re New York, N.H. & H.R.R.,* 289 F.Supp. 451 (D.Conn.1968), and *New York, N.H. & H.R.R. v. United States,* 289 F.Supp. 418 (S.D.N.Y.1968) (three-judge court), that the Commission held further hearings and announced a new valuation of $140 million.

**3.** The Supreme Court affirmed the reorganization court's valuation of the New Haven's assets. 399 U.S. 392 (1970); see generally *In re New York, N.H. & H.R.R.,* 479 F.2d 8, 11 (2 Cir. 1973).

and refunding mortgage since 1947, the firm continued to represent Manufacturers in that capacity.

Manufacturer's position as trustee under mortgages of the New Haven and of the New York Central presented no conflicts problems prior to June 21, 1970. On that day, however, when the Penn Central filed for reorganization, Manufacturers found itself representing conflicting interests. On the one hand, it was the indenture trustee under the first and refunding mortgage of the New Haven; and, on the other hand, it was a creditor of the Penn Central[4] and trustee under mortgages of the New York Central.[5]

In July 1970 Manufacturers undertook to extricate itself from this conflict of interests. It informed both the New Haven and the Penn Central reorganization courts, as well as the various trustees and their counsel, of the situation.[6] It then began a comprehensive effort to find successor corporate trustees for the New Haven mortgage and the eighteen New York Central mortgages. Between July 1970 and June 1971 Manufacturers contacted at least sixty-two banks. Its search included every commercial bank east of the Mississippi that had a substantial trust department and did not have a conflict of interest (such as being a creditor of the Penn Central). On July 29,

1971 the New Haven reorganization court appointed the first of the present individual successor trustees, for the reason that, "[a]lthough the underlying mortgage itself specified that a successor trustee must be a qualified bank, the court . . . could not permit a valid trust to fail for lack of a trustee . . . ."[7] 421 F.Supp. at 264. Manufacturers had not included individuals in its search because of the terms of the mortgage.

Meanwhile, the potential conflict recognized by Manufacturers as of June 21, 1970 became an actual one very quickly. Following the Supreme Court's remand, the New Haven reorganization court entered an order with broad notice provisions to determine what should be done to protect the New Haven's creditors. This resulted in due course in the entry of an order on June 22, 1971 pursuant to which the court sought to give the New Haven estate secured-creditor status by declaring "an equitable lien . . . on all of the former assets transferred by the New Haven to Penn Central, exclusive of (a) rolling stock and (b) the New Haven's one-half interest in the excess income from the Grand Central [Terminal] properties" and, as to "the latter item of property . . . [by declaring] a constructive trust in favor of the New Haven

---

**4.** Manufacturers is one of several bank participants in a $300 million loan to Penn Central under a credit agreement dated April 1, 1969. It also is one of the banks that loaned $50 million to the Pennsylvania Company, a subsidiary of Penn Central, under a credit agreement dated March 21, 1970. It also is the holder of certain equipment obligations of Penn Central subsidiaries. See Petition of Manufacturers Hanover Trust Company and A. Frederick Keuthen, 12 New York, N.H. & H.R.R. Reorganization Proceedings 8721, 8722 (June 21, 1971).

**5.** Manufacturers was trustee under eighteen New York Central mortgages, including the New York Central & Hudson River Railroad Company Gold Bond mortgage which covers the Grand Central Terminal properties.

**6.** In Kelley, Drye's petition to intervene in the Penn Central reorganization proceedings, one of its partners stated:

"However the situation came about, we and Manufacturers have decided, I believe correctly, that its duty to the bondholders

under these mortgages requires us to intervene in this proceeding as soon as we can, rather than leaving them unrepresented until (and if) separate trustees and counsel, unconnected with this reorganization, can be found for each trust."

**7.** The court on that date appointed Lawrence W. Iannotti, Esq., one of the appellants here, as successor indenture trustee under the New Haven's first and refunding mortgage. Later, in January 1972, the Chase Manhattan Bank, N.A., resigned as trustee under the New Haven's general income mortgage because it was a creditor of the Penn Central. The court appointed Jacob D. Zeldes, Esq., the other appellant here, as successor indenture trustee under that mortgage.

Manufacturers remains to this day as trustee under seventeen of the New York Central mortgages. It found a successor for, and resigned from, the Gold Bond mortgage trusteeship on September 4, 1975. 421 F.Supp. at 265.

estate." *In re New York, N.H. & H.R.R.*, 330 F.Supp. 131, 142 (D.Conn.1971).

During the proceedings which resulted in the order of June 22, 1971, the New Haven's interests were supported by, among others, the New Haven's trustee and Manufacturers as the indenture trustee, Manufacturers being represented by Simpson Thacher. Interests which opposed imposition of an equitable lien or constructive trust included the Penn Central, represented by the Washington, D.C. law firm of Covington & Burling; and Manufacturers, as indenture trustee under the Gold Bond mortgage, represented by Kelley, Drye. Covington & Burling assumed the lead role in opposing imposition of the equitable lien and constructive trust. The incongruity of the situation nevertheless was apparent. As the court put it,

> "The startling result was that, on opening court one morning, the New Haven reorganization court was handed a brief by the Simpson, Thacher firm from Manufacturers Hanover Trust Company for the New Haven side of the case, and it was then handed another brief by the Kelley, Drye firm from the Manufacturers Hanover Trust Company for the other side of the same case." 421 F.Supp. at 265.

Through Simpson Thacher, Manufacturers supported the New Haven trustee's position in favor of imposing an equitable lien and constructive trust. Through Kelley, Drye, Manufacturers took the position that the New Haven reorganization court lacked jurisdiction over the New Haven assets that had been conveyed to the Penn Central.

Shortly after the New Haven reorganization court's decision, referred to above, which imposed an equitable lien and a constructive trust in favor of the New Haven

estate on the transferred assets, Manufacturers and Mr. Keuthen on June 22, 1971 filed their applications to resign from the New Haven's first and refunding mortgage trusteeship. On July 29 the court approved the resignations and appointed Mr. Iannotti as successor trustee.

Penn Central appealed to our Court from the order entered on June 22, 1971. This appeal resulted in our decision of March 17, 1972 that the New Haven reorganization court lacked jurisdiction over the New Haven's assets which had been transferred to Penn Central. *In re New York, N.H. & H.R.R.*, 457 F.2d 683 (2 Cir.), *cert. denied*, 409 U.S. 890 (1972). As in the proceedings before the reorganization court, Manufacturers and Kelley, Drye, in challenging the order under review, participated in a subordinate role on the appeal and on the certiorari proceedings; Covington & Burling took the lead as counsel to Penn Central. Manufacturers nevertheless did participate as it had to (and as it will continue to do if necessary) in its capacity as trustee under the remaining New York Central mortgages.

The upshot is that the New Haven interests still have not been paid by the Penn Central estate.[8]

## II.

It was against this background that applications were filed on June 16, 1975 in the New Haven reorganization court by Manufacturers and several other bondholder representatives seeking compensation for services rendered and reimbursement of expenses, including attorneys' fees. The applications were filed pursuant to § 77(c)(12) of the Bankruptcy Act, 11 U.S.C. § 205(c) (12) (1970).[9] After a hearing on May 18,

---

**8.** The present balance, exclusive of interest, due from the Penn Central is $121,959,605.02, according to the Statement of Assets, Liabilities and Capital Deficit as of September 30, 1976 submitted to the New Haven reorganization court on October 21, 1976 by counsel for the New Haven Trustee.

Professor Moore informed us at the time of oral argument that shortly prior thereto there had been submitted to the Penn Central reorga-

nization court a consensual plan of reorganization for the Penn Central providing for payment to the New Haven interests of $174,000,-000 or its equivalent.

**9.** Section 77(c)(12) of the Bankruptcy Act, 11 U.S.C. § 205(c)(12) (1970), in relevant part provides:

"Within such maximum limits as are fixed by the Commission, the judge may make an

1976 the court filed its opinion, order, and judgment on June 30, 1976. To the extent here relevant,[10] the court allowed compensation to Manufacturers in amount of $103,018.34 as reimbursement for expenses and in amount of $304,416.67 as compensation for services. The court directed, however, that payment of the latter amount be contingent on the New Haven's recovery of the purchase price of its assets owed by the Penn Central. This was done by limiting Manufacturers' compensation for services to ¼ of 1% of the amount to be recovered by the New Haven from the Penn Central, such payment in no event to exceed $304,416.67. The contingent basis of the allowance to Manufacturers in this respect was grounded on the court's findings that Manufacturers had pursued interests adverse to the New Haven estate by representing the interests of the eighteen New York Central mortgages (which interests, except for the Gold Bond mortgage, it still is obliged to pursue); that such conduct constituted a breach of fiduciary duty under *Woods v. City National Bank & Trust Co.,* 312 U.S. 262 (1941); and that such breach "impeded, and therefore damaged, the New Haven reorganization trustee's collection of the sums owed the New Haven estate . . . and has frustrated the further development of a plan of reorganization for the New Haven. . . ." 421 F.Supp. at 266.

In addition to the allowance to Manufacturers itself referred to above, the court also allowed to Manufacturers the sum of $808,000 as compensation for its attorneys, Simpson Thacher & Bartlett, plus $15,234.81 as reimbursement for the latter's expenses.[11]

allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and within such limits may make an allowance to be paid out of the debtor's estate for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries and such assistants as the Commission with the approval of the judge may especially employ. Appeals from orders of the court fixing such allowances may be taken to the court of appeals independently of other appeals in the proceeding and shall be heard summarily. . . ."

Following the statutory procedure for § 77(c)(12) applications, the reorganization court originally referred the applications to the Interstate Commerce Commission so that the latter could set maximum levels of compensation. On February 5, 1976, however, Congress enacted the Railroad Revitalization and Regulatory Reform Act (the 4R Act), Pub.L.No.94–210, 90 Stat. 118. Section 618(b)(4) of the 4R Act in relevant part provides:

"The powers and duties of the Commission under section 77 of the Bankruptcy Act (11 U.S.C. 205), with respect to a railroad in reorganization in the region which conveys all or substantially all of its designated rail properties to the Corporation or a subsidiary thereof, or to profitable railroads in the region, pursuant to the final system plan, and the requirement that plans of reorganization be filed with the Commission, shall cease upon the date of such conveyance. The powers and duties of the Commission under section 77 of the Bankruptcy Act shall also so terminate, as of the date of enactment of this paragraph, with respect to any railroad in reorganization under such section 77 but not subject to this Act which (1) does not operate any line or railroad, and (2) has transferred all or substantially all of its rail properties to a railroad in reorganization in the region which was subject to this Act prior to the date of enactment of this paragraph. Thereafter, such powers and duties of the Commission shall be vested in the district court of the United States which has jurisdiction of the estate of any such railroad in reorganization at the time of such conveyance" . . . .

Since the 4R Act terminated the Commission's jurisdiction over these applications and vested in the reorganization court the powers and duties of the Commission with respect to them, the applications were deemed refiled with the reorganization court.

10. In addition to the allowances granted to Manufacturers, the court granted allowances to various other participants in the reorganization, as set out in the schedule of payments at 421 F.Supp. at 272–73.

11. The court also allowed to Manufacturers a contingent fee on account of the legal services of Simpson Thacher. The contingent nature of this allowance has nothing to do with Manufacturer's breach of fiduciary duty. The award is a standard contingent fee. Simpson Thacher, along with two other law firms who had repre-

The instant cross-appeals [12] were taken by Messrs. Iannotti and Zeldes, the respective successor indenture trustees under the New Haven's first and refunding mortgage and its general income mortgage, from that part of the court's judgment of June 30, 1976 referred to above. Appellees are Manufacturers and Richard Joyce Smith, the New Haven trustee. The latter has taken the position before us, as he did before the New Haven reorganization court, that, although Manufacturers was involved in a conflict of interest, it should not be denied compensation for services, expenses and attorneys fees. Appellants argue that Manufacturers should not recover *any* compensation for services, expenses, or attorneys' fees from the estate with which it had, and continues to have, a conflict of interest.

The questions thus presented are whether the New Haven reorganization court as a court of equity had the authority in the exercise of its discretion to allow compensation and expenses to Manufacturers and its counsel in view of Manufacturers' position of conflict; and, if so, whether the reorganization court exercised sound discretion in granting the allowances here involved.

## III.

We turn to the first question presented: whether the reorganization court had the authority in the exercise of its discretion to grant any allowances at all to Manufacturers and its counsel. We hold that it did.

Appellants ask us to hold that Manufacturers cannot recover [13] any payments in the reorganization court—either "compensation for [its] services" or reimbursement of its "actual and reasonable expenses (including reasonable attorney's fees)". Appellants contend that, once a bankruptcy court finds a conflict of interest, it must close its eyes to the equities and disallow any and all payments. In short, appellants argue that the chancellor under such circumstances has open to him only one course: total disallowance of all payments; or, put another way, he has no discretion to act on the applications for allowances, even if his discretion is exercised on the basis of long familiarity with the reorganization, the undisputed value of the services of the fiduciary and its counsel, and the nature and cause of the conflict involved.

For the reasons below, we reject appellants' interpretation of the law. It would strip the reorganization court as a court of equity of its authority to exercise sound discretion. It would render equity inequitable.

As all counsel acknowledge, the late Judge Learned Hand was in the vanguard

---

sented the first mortgage bondholders committee and the Chase Manhattan Bank (Migdal, Tenney, Glass & Pollak, and Dewey, Ballantine, Bushby, Palmer & Wood, respectively), participated in the New Haven reorganization proceedings on a contingent fee basis. Although the attorneys were successful in obtaining an increase in the purchase price for the New Haven assets as a result of the decision by the Supreme Court in the *New Haven Inclusion Cases, supra,* there was no cash payment. As Professor Moore stated at oral argument before us, "The price was excellent but the New Haven was paid in Confederate money." The New Haven reorganization court therefore ordered that "in the event that there is a future recovery by the reorganization trustee . . . of payments by the Penn Central . . . , on account of the purchase price fixed by the Supreme Court for the New Haven properties in the *New Haven Inclusion Cases,*" each of the three law firms will receive a fraction of such payment or payments. 421 F.Supp. at 272. Simpson Thacher in that event would receive ¼ of 1% of the amount recovered.

**12.** Appellants' notices of appeal are denominated "cross-appeals" because they followed notices of appeal by Manufacturers and the Commission from the reorganization court's original order and judgment of June 30, 1976, as supplemented by its order of August 23, 1976. 421 F.Supp. at 273. The Commission's appeal was withdrawn and Manufacturers' appeal has not been pursued.

**13.** Appellants at the outset phrase the question presented as one of law: "[W]hether a former indenture trustee . . . *can recover* payments for compensation, expenses and attorneys' fees from the debtor's estate. . . ." (emphasis added). We note this not as a matter of semantics, but perhaps as an indication of the misapprehension of appellants' able counsel as to the role of a bankruptcy court as a court of equity, 11 U.S.C. § 11 (1970), in dealing with the very unusual facts with which the reorganization court here was confronted.

in articulating the equitable principles with which we are here concerned. A good starting point, it seems to us, is Judge Hand's reference to Aristotle's description of the role of "the equitable" in construing the law:

> "All law is universal but about some things it is not possible to make a universal statement which shall be correct . . . . Hence the equitable is just, and better than one kind of justice—not better than absolute justice but better than the error that arises from the absoluteness of the statement. And this is the nature of the equitable, a correction of law where it is defective owing to its universality. . . ." Ethics, Book V, Chapter 10 fol. 1137, lines 12–28, in IX *The Works of Aristotle* (W.D. Ross trans. 1925), *quoted in* L. Hand, The Bill of Rights 21–22 (1958).

Having in mind that flexibility is one of the essential characteristics of equity and that conceptions of equity necessarily will vary from chancellor to chancellor, the thread that runs consistently through the cases is that the remedy granted or penalty imposed by equity must be tailored to fit the particular case at hand.

This brings us to the applicable case law. We are not aware of any case in which a railroad reorganization court has construed the effect of a conflict of interest on an application for compensation under § 77(c)(12), the provision pursuant to which the instant application was filed. The courts, however, have considered the issue under Chapter X and its predecessor, § 77B.

The leading cases which we believe at least point to the correct decision here are two Supreme Court opinions, *Woods v. City National Bank & Trust Co.,* 312 U.S. 262 (1941); *Wolf v. Weinstein,* 372 U.S. 633 (1963), and two opinions written by Judge Learned Hand for our Court, *Berner v. Equitable Office Building Corp.,* 175 F.2d 218 (2 Cir. 1949); *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917 (2 Cir.), *cert. denied,* 340 U.S. 813 (1950). We shall discuss each briefly to the extent here applicable.

*Woods v. City National Bank & Trust Co., supra,* is the leading Chapter X case in point. It recognizes the inherent discretionary *power* of a reorganization court to disallow compensation for services and expenses on the ground of conflict of interest; but it does not *require* that a reorganization court do so. The Court in *Woods* did not reject a district court's allowance of compensation; rather, it reversed the court of appeals' reversal of the district court, noting that the district court's findings of a conflict that warranted complete disallowance were "amply supported by the evidence." 312 U.S. at 269.[14]

It is clear from the opinion in *Woods* that the Court was considering the power of a reorganization court to deny compensation, not its obligation to do so. "The basic question involved in this case concerns the power of the District Court in proceedings under Ch. X of the Chandler Act (52 Stat. 840) to disallow claims for compensation and reimbursement on the grounds that the claimants were serving dual or conflicting interests." *Id.* at 262 (footnote omitted). The Court went on to explain that this power derives from the "bankruptcy court['s] . . . plenary power to review

---

**14.** The nature of the conflict of interest in *Woods* was in sharp contrast to that in the instant case. There, claims for compensation were filed by an indenture trustee, the members of a bondholders' committee, and the committee's counsel. The bondholders' committee, originally organized by the indenture trustee, included employees of the indenture trustee's corporate reorganization department as well as employees of an underwriter heavily interested in the debtor's stock and under threat of suit for defrauding the bondholders. The same firm of attorneys which had been retained by the indenture trustee was employed by the commit- tee. Thus the interlocking personnel of the committee and the indenture trustee represented the depositing bondholders who were interested in having a low upset price fixed for the debtor's property, the non-depositing bondholders who were interested in a high upset price, and a large stockholder who sought a favorable position in the reorganization at the expense of both. The essential ground upon which the reorganization court disallowed the claims for compensation was that the claimants were pursuing interests of their own that were either of no benefit to the estate or were adverse to it.

all fees and expenses in connection with the reorganization . . . ." *Id.* at 267. See also *American United Mutual Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 146 (1940) (involving a plan for the composition of the debts of a municipality under Chapter IX of the Bankruptcy Act).[15]

We do not overlook other language in *Woods* that can be read more broadly. For example, "[w]here a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation." 312 U.S. at 268. This statement of the general rule of course is understandable in view of the particular facts and actual holding of the case. See note 14 *supra*. Application of the general rule in *Woods* led to and buttressed the district court's denial of compensation and pointed up the error of the court of appeals in reversing the district court. *Woods'* recognition of the general rule, however, does not strike us as a mandatory requirement that reorganization courts woodenly must deny compensation in every case of conflict of interest, regardless of the facts.[16]

This need for flexibility to be exercised by a reorganization court in dealing with a conflict of interest has been recognized by our Court in the two corporate reorganization cases referred to above which were decided after *Woods.*

In *Berner v. Equitable Office Building Corp., supra,* a Chapter X case, the district court had completely disallowed compensation to Berner, an attorney, apparently on the basis of § 249 of the Bankruptcy Act, 11 U.S.C. § 649 (1970), which denies all compensation to a fiduciary who has traded in the debtor's stock.[17] Our Court, in an opinion by Judge Learned Hand, reversed the district court on the ground that there had not been adequate proof that Berner had acquired an interest in the debtor's stock. In the course of the opinion which reviewed the applicable authorities, including *Woods,* 175 F.2d at 220 & n. 3, Judge Hand stated that "there was no proof of conduct which necessarily forfeited his rights either under § 249, or upon general equitable principles; *but that there was proof of conduct which required his allowance to be reduced in an amount which the district court should fix in its discretion. . . ." Id.* at 219 (emphasis added). Thus, after concluding that Berner's conduct in divulging inside information to one Bell, who did purchase shares, amounted to a breach of trust to the

---

**15.** The Court in *American United, supra,* 311 U.S. at 145, in reaffirming the essential character of a bankruptcy court as a court of equity, quoted from the seminal opinion in *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455 (1940):

"A court of equity may in its discretion in the exercise of the jurisdiction committed to it *grant or deny relief upon performance of a condition which will safeguard the public interest."* (emphasis added).

**16.** We view likewise the statement of the Court in *Woods* that "[w]here an actual conflict of interest exists, no more need be shown in this type of case to *support* a denial of compensation." 312 U.S. at 268 (emphasis added). That is precisely what the Court held in *Woods,* namely, that the findings of the district court were sufficiently supported by the evidence to *warrant denial of compensation.* The Court did not hold that denial of compensation would be required regardless of the district court's findings.

Moreover, the voluntarily assumed conflict-laden situation in *Woods,* see note 14 *supra,* is a far cry from the unusual circumstances of the instant case. We need not decide here whether the Court's approval of the denial of compensation in *Woods* requires that compensation always should be denied in factually similar situations. See *In re Ritz Carlton Restaurant & Hotel Co.,* 60 F.Supp. 861, 865–66 (D.N.J.1945). *Woods* certainly provides guidance to the reorganization courts on the issue. See generally *In re American Acoustics,* 97 F.Supp. 586, 589 (D.N.J.1951). By the same token, however, *Woods* does not relieve a reorganization court of its duty, once it has found a conflict, to weigh the facts of a particular case for and against allowing compensation.

**17.** Section 249 of the Bankruptcy Act, 11 U.S.C. § 649 (1970), in relevant part provides:

"No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock or by whom or for whose account such claims or stock have, without the prior consent of the judge, been otherwise acquired or transferred."

shareholders from whom Bell had bought, Judge Hand remanded the case to the district court with these instructions:

"[W]e think that the consequences should be only those which attend any breach of trust in equity: i. e., that in determining what the trustee's compensation shall be, the court will, as a matter of discretion, diminish the allowance which it would otherwise make, in proportion to the gravity of the breach."  *Id.* at 222 (footnote omitted).

In *Silbiger v. Prudence Bonds Corp., supra,* a § 77B case, where an attorney represented members of two classes of bondholders whose interests conflicted, the district court had allowed compensation to the attorney, to be paid from funds distributed to the holders of the series of bonds which were fully compensated in the reorganization.  Judge Learned Hand, who again wrote the opinion for our Court, expressly followed the course taken in *Berner* of leaving to the discretion of the district court "[h]ow far the penalty [because of the conflict of interest] should be mitigated," 180 F.2d at 921, and remanded the case to the district court for that purpose.

We recognize, as Judge Hand noted in *Silbiger,* that "the usual consequence has been that [an attorney who represents opposed interests] is debarred from receiving any fee from either, no matter how successful his labors", *id.* at 920, and that usually "the prohibition is absolute and the consequence is a forfeiture of all pay."  *Id.* at 921.  We further recognize that the salient distinguishing factor relied upon in *Silbiger* was the fact that the "attorney [was] not paid in any part by the side he [had] opposed", or, expressed differently, that "the allowance . . . [came] in no part out of any group that [could] have been preju-

diced by the attorney's divided allegiance."  *Id.* at 921.

■ By contrast, any allowance to Manufacturers in the instant case necessarily will diminish the funds available to meet the obligations of the New Haven estate to the holders of its general income bonds and may diminish the payment to its first mortgage bondholders.  Yet the presence of the particular circumstance which justified our departure from the general rule in *Silbiger* should not be treated as a necessary condition for departing from the general rule in all cases.  The critical point is that because of the particular exceptional circumstance in *Silbiger* we concluded that to deny the attorney compensation would be inequitable, contrary to the rationale for denying compensation in the first place.  We did not rule out the possibility that there might be other, equally compelling, exceptional circumstances.  In short, we decline appellants' invitation to us to construe *Silbiger* in a way that would render equity inequitable in the instant case.[18]

This brings us to *Wolf v. Weinstein, supra,* another Chapter X case, which appellants say worked a radical change in the law.  They argue that after *Wolf* the flexibility that traditionally inhered in a court of equity's treatment of applications for compensation no longer is permissible.  We disagree.  We believe that *Wolf* bears only marginally, if at all, on the question presented by the instant appeal.

The issue in *Wolf* was whether certain persons who had traded in the debtor's stock during the reorganization proceedings were fiduciaries so as to trigger the prohibition against compensation provided in § 249 of the Bankruptcy Act.[19]  The district court held they were.  We held they were not.  The Supreme Court agreed with the district

---

**18.** Our holdings in *Berner* and *Silbiger* have been followed by the Seventh Circuit in *Chicago & West Towns Rys. v. Friedman,* 230 F.2d 364 (7 Cir.), *cert. denied,* 351 U.S. 943 (1956). There a law firm represented both a committee of the debtor's bondholders and a potential buyer of the debtor.  The Court of Appeals, in reducing the district court's award from $12,-000 to $7,000 because of the firm's involvement in a clear conflict of interest between buyer and seller, recognized that the district court could have disallowed the fee completely on the authority of *Woods.*  The Court of Appeals chose instead to follow the "less harsh rule" of *Silbiger* and *Berner,* which would impose a "penalty of less than full forfeiture".  230 F.2d at 369.

**19.** See note 17 *supra.*

court. It was undisputed that § 249 would operate automatically to deny all compensation to the President and General Manager of the debtor *if* they were considered "other person[s] acting in the proceedings in a . . . fiduciary capacity" within the meaning of the statute. *Wolf* involved *who* comes under the statute, not whether the statute's prohibition against compensation is absolute, automatic, and admitting of no exceptions. The only question before the Court was whether "§ 249 was meant to broaden the classes of fiduciaries to be subjected to [the] traditional sanction" of denying compensation. 372 U.S. at 645. The Court held that it was.

In reaching its decision, the Court discussed the legislative history and purpose of § 249. It treated the problem essentially as one involving "the evil of insider trading by fiduciaries during corporate reorganization." Note, 37 Temp.L.Q. 342 (1964). This is quite apparent from its discussion of § 249, together with § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1970), as a dual attack by Congress on a single problem, 372 U.S. at 643, and its recognition of the "common origins and parallel purposes of § 249 and § 16(b)". *Id.* at 643 n. 11. The Court noted with approval the suggestion of several courts "that a paramount objective of § 249 was to check the misuse for private gain of inside information or control, to which the position of a representative or fiduciary gives him access." *Id.* at 642 n. 10. As in § 16(b) cases, the Court had little trouble in applying § 249 without exception "[i]n the light of its clearly revealed objectives." *Id.* at 643.

The Court made it clear that § 249 is based on traditional equitable principles. Even before 1938, when Congress enacted § 249 as part of the Chandler Act,

"§ 77B's broad mandate that fees and allowances must be 'reasonable' to merit judicial approval had been held sufficient authority by two federal courts to sanction denial of compensation to persons holding fiduciary positions in reorganization proceedings who had traded in the

Debtor's stock. *In re Paramount-Publix Corp.,* 12 F.Supp. 823, 828, rev'd in part, 83 F.2d 406; *In re Republic Gas Corp.,* 35 F.Supp. 300. These decisions found even in the general terms of the statute the embodiment of 'ancient equity rules governing the conduct of trustees, including deprivation of compensation where there is a departure from those rules.' . . ." 372 U.S. at 641.

■ Appellants argue, on the basis of the Court's recognition in *Wolf* of the roots of § 249 in equity, that that statute's absolute prohibition against compensation should apply by analogy to *all* cases involving fiduciaries' applications for compensation. They seek to transform the narrow holding of *Wolf* and its discussion about the antecedents of § 249 into a binding interpretation of the rule of equity applicable to all applications for compensation by fiduciaries. In this manner appellants attempt to avoid the critical fact that *Wolf* dealt with a specific statutory rule.

To recognize, however, that § 249 is based on equitable principles, or even that it codifies the rule of certain equitable decisions, does not reduce the broad realm of equity to the requirements of § 249. The lesser does not include the greater. Congress may have made the general rule the only rule, without room for exception, for the purpose of dealing with a particular form of breach by fiduciaries, but it most assuredly did not purport to reach all kinds of conflicts of interest. Granted, trading in the debtor's stock is a form of conflict of interest in which the fiduciary is torn between his duty to the debtor and his own self-interest. In a particular case the harm may vary in degree and it may be more or less deserving of sanction than other forms of breach of a fiduciary. Congress chose, however, to single out insider trading as a form of disloyalty particularly to be discouraged, even in cases of little or no actual harm. Surely equity may deny all compensation in other cases of disloyalty; but, just as surely, equity is not required to do so. The Supreme Court recognized this in *Wolf* when it stated that "there are various forms of disloyal-

ty or conflict of interest which would disentitle an officer to compensation under general principles of equity and quite without regard to any statutory provision." 372 U.S. at 647–48 (footnote omitted). In those cases, however, traditional notions of equity govern; § 249 and *Wolf* are inapplicable.[20]

Absent a statutory directive at least as clear as the Court thought § 249 to be, we see no warrant for requiring a court of equity to close its eyes to the harshness of a result "in proportion to the gravity of the breach." *Berner, supra,* 175 F.2d at 222. A majority of the Court in *Wolf* was not troubled by the harshness of the result,[21] in part because the result was

"wholly consistent with the uniform application of [§ 249] by the lower courts. As the Court of Appeals for the Second Circuit [had] recognized in an earlier case, '[t]his result may well work harshly in individual cases . . . . But in § 249 . . . Congress clearly intended drastic results and thought them necessary to eliminate the serious abuses of insider information which had long been existent in equity reorganizations.' " 372 U.S. at 654 (quoting *Surface Transit, Inc. v. Saxe, Bacon & O'Shea,* 266 F.2d 862, 868 (2 Cir. 1959).[22]

The Court could hardly have made it more plain in *Wolf* that universal harshness, absent a statutory directive, was far from its intended result:

"In light of the seriousness of the abuses which the statute was designed to prevent, it has been thought that to allow any . . . exception or dispensation would frustrate the manifest intent of Congress to impose an effective prophylactic rule. That the rule occasionally bars compensation to those whose conduct might not have been considered inequitable or disloyal in the absence of such a statute is no reason to suspend or make selective the operation of the statute's sanctions." 372 U.S. at 655–56 (footnote omitted).

■ We hold that the New Haven reorganization court here, absent any statutory

---

**20.** We are not persuaded by appellants' argument that, because § 249 gives effect to traditional equitable principles, the Supreme Court in *Wolf* considered the admittedly harsh impact of § 249 to be representative of those principles, as embodied for example in *Woods.* By giving effect to a specific statutory provision and noting that such effect was not inconsistent with what had been done before, we do not believe that the Court meant to equate § 249 with the "traditional sanction". Although appellants are correct that the holding in *Wolf* is not that § 249 imposes a harsher penalty on certain fiduciaries than would general equitable principles, they fail to recognize that § 249 requires imposition of the penalty regardless of the equities. Section 249 may not increase the harshness of the sanction in a particular case, but it increases the frequency of the sanction and unshrinkingly compels its imposition in every case in which it applies. Therein lies its harshness.

Despite the vigor with which appellants urge their "*Woods/Wolf* synthesis", we think it is clear that *Wolf* deals only with § 249 and was not intended to imply a radical change in one of equity's essential characteristics. As one commentator has stated the distinction between the rigid statutory bar of § 249 and the more flexible equitable principles:

"The problem of *Wolf v. Weinstein* is a close and a difficult one. It is not the question whether insider trading shall go unregulated and uncontrolled. It is the problem whether it should be governed by § 249, with its rigid penalty and its automatic impact, or whether it should be dealt with by the more flexible doctrines of equity. The statutory remedy is more sure and direct in its impact; the equitable one presents greater difficulties of proof, need not be as severe, and can be tailored in its sanction to meet particular situations."

Kaplan, *Wolf v. Weinstein: Another Chapter on Insider Trading,* 1963 S.Ct.Rev. 273, 290.

**21.** But see Mr. Justice Harlan's dissent:

"On that score I fully agree with Judge Friendly that at 'the very least, courts are justified in demanding a clear indication of Congressional purpose before inflicting' such a 'Draconian penalty' (296 F.2d at 683) as the Court's decision now imposes on petitioners . . . .." 372 U.S. at 657.

**22.** Appellants argue that in *Surface Transit* we indicated that the discretionary approach of *Berner, supra,* might no longer be the law of this Circuit. We find it neither necessary nor appropriate for us to rule on the effect of *Surface Transit* as a § 249 case on *Berner,* for *Surface Transit* certainly does not undermine Judge Hand's view of equity's discretion in the context of a case such as the instant one where that statutory provision is not even arguably relevant.

directive such as § 249, correctly concluded that it had discretion as a court of equity to act on the instant applications without being bound by an absolute rule prohibiting compensation in a case of conflict of interest regardless of the facts. We decline to alter the essential nature of the equitable rule or to prohibit a correction of law where it would be defective owing to its universality.

## IV.

We turn next to the second question presented: whether the reorganization court exercised sound discretion in allowing the compensation and expenses in question. We hold that it did.

■ Judge Anderson had presided over the New Haven reorganization continuously since its inception in 1961. He was fully aware of all the vicissitudes of the extraordinarily difficult and complex proceedings. He knew the attorneys and parties involved. He was uniquely well qualified to assess their respective contributions. He was personally cognizant of all of the circumstances attending Manufacturers' conflict of interest, and was in the best position to evaluate its bearing on the reorganization. He, more than anyone else, knew the value of the assistance of imaginative and cooperative creditor representatives in helping with whatever steps were necessary to keep the trains running. Under such circumstances, appellants have a heavy burden of demonstrating that this experienced judge, in dealing with the delicate situation presented by Manufacturers' application for compensation and expenses, failed to act conscientiously and fairly—in short, that he abused his discretion.

Although the reorganization court found a conflict of interest on the part of Manufacturers, it made very clear that Manufacturers was not at fault:

"The Manufacturers Hanover Trust Company, *through no action of its own, found itself in a position between conflicting interests*, as to each of which it was in a position of indenture trustee. It could not help one without hurting the other." 421 F.Supp. at 266 (emphasis added).

The italicized words emphasize the court's critical finding of fact with respect to the salient characteristic of this conflict of interest: it was completely involuntary.

■ A basic tenet of trust law is that "[o]rdinarily a trustee does not commit a breach of trust if he does not intentionally or negligently do what he ought not to do or fail to do what he ought to do." Restatement (Second) of Trusts § 201 (1959), comment a. The element of voluntariness is critical.[23] Manufacturers did not commit a breach of trust simply by finding itself between conflicting interests when the Penn Central filed for reorganization. If there was a breach at all, it would have occurred when Manufacturers failed to extricate itself from the conflict.

■ The court, however, found that Manufacturers made every possible effort to extricate itself. It was not until the court decided to replace the bank with an individual that a successor trustee could be found. It is true that all concerned agreed that Manufacturers should have resigned immediately from its trusteeships on one side or the other, or both. The Chairman of the Board of Manufacturers believed that that was the right thing to do. But that does not support appellants' assertion that the court would have ordered Manufacturers to resign if it had petitioned the court for instructions. To resign at the very moment the bondholders needed representation at the hearings on whether an equitable lien

---

**23.** Compare the undiscriminating effect of § 249:

> "It is not only voluntary purchases or sales of a debtor's securities to which Section 249 applies. It denies compensation as well to any person acting in a reorganization proceeding in a representative or fiduciary capacity *for whose account* claims against or securities of the debtor have been purchased or sold without the prior consent or subsequent approval of the judge in the reorganization proceeding. The bona fides' of such purchases or sales is not material under Section 249." *In re Cosgrove-Meehan Coal Corp.*, 136 F.2d 3, 5–6 (3 Cir. 1943) (emphasis in original).

should be declared in New Haven's favor would not have fulfilled Manufacturers' fiduciary duties. Whatever Manufacturers did—resign and leave the bondholders helpless or stay on in the middle of a conflict—would not have comported with the duty it owed to the bondholders on each side. In view of the irrebuttable fact that Manufacturers was in a complete bind, the question is whether there was *anything* Manufacturers could have done that would save Manufacturers' right to compensation in the opinion of the successor trustees. Beyond asserting that Manufacturers should have taken immediate steps "to withdraw from one side or the other or both", appellants reply that Manufacturers should have petitioned the court for instructions, see *Mosser v. Darrow*, 341 U.S. 267, 274 (1951); *Silbiger v. Prudence Bonds Corp., supra*, 180 F.2d at 921; Restatement (Second) of Trusts § 259 (1959), or should have taken the firm stand that it would resign unless directed by the court to stay on. Although such action on Manufacturers' part would have served immeasurably to clarify matters, we do not view Manufacturers' failure to do so as dispositive under the circumstances of this case.

It is easy to look back years later and rethink Manufacturers' alternatives. But viewing the situation realistically, it is clear that the court was aware of the conflict; that Manufacturers was not trying to conceal anything; and that the court's order that briefs be filed and a hearing held on the equitable lien issue required immediate action by all parties. Someone had to represent the bondholders at the August 1970 hearing, which took place while the search for a successor trustee was under

way. Manufacturers had no sooner conceived the idea to resign than its attorneys, on both sides, advised that it could not resign without leaving the bondholders stranded. Thus, on the advice of both of its firms of attorneys, Manufacturers chose the best *possible* alternative, by having each firm represent separately the respective interests.[24]

Under such circumstances, a petition for instructions or a gesture of resignation would have been futile. The law does not require that one act in vain. Although a petition for instructions might have been fruitful in assuring that no question could be raised later about Manufacturers' right to compensation, see *Mosser v. Darrow, supra*, 341 U.S. at 274, that is irrelevant to the question whether such action would have better protected those to whom Manufacturers owed a fiduciary duty. It is unlikely that a petition for instructions would have resulted in any material change in Manufacturers' course of action. The likely futility of petitioning for instructions distinguishes this case from others in which the failure to seek instructions was deemed significant. Yet even in *Silbiger, supra*, where the court might well have instructed the attorney to cease his representation of opposing interests and where nothing justified the attorney's failure to seek instructions from the court, we held that the penalty of full forfeiture should be ameliorated in the discretion of the district court.[25]

■ Of crucial significance here is the undisputed fact that the indenture trustee's services and those of its counsel were of tremendous value to the estate from 1961

---

**24.** Appellants and the reorganization court discuss this so-called "insulation theory" as if it were an affirmative notion on the part of Manufacturers. The opinion below states that Manufacturers' "first solution was to assign one of its lawyers to one side and another of its lawyers to the other." 421 F.Supp. at 265. This is perhaps an oversimplification in view of the facts related above about the history of the merger of the respective trustees under the different indentures and Manufacturers' continuous use of separate counsel for what became the two sides of this conflict. See *ante* pp. 169–

170. Indeed, the availability of separate counsel already representing each side was the single positive fortuity in this very difficult situation.

**25.** We wish to emphasize that our holding in the instant case is not to be construed as sanctioning dilution of the rule that a fiduciary in doubt should petition the court for instructions. We merely hold that Manufacturers' failure to do so under the unique circumstances of this case does not operate as an automatic bar to Manufacturers' compensation.

until the conflict arose in June 1970.[26] No one has challenged the value of those services.[27] At oral argument appellants corroborated appellees' representation that the "vast majority of the claim" related to services rendered before the conflict arose. Appellants stated that "the bulk of the hours logged by Manufacturers and its lawyers without question occurred prior to the conflict . . . ." This factor properly was taken into account by the reorganization court. The absolute principle that "an applicant [under § 249] who has engaged in forbidden transactions near the end of the proceeding is to be denied compensation for all services he has rendered to the Debtor, however valuable those services may have been," *Wolf v. Weinstein, supra,* 372 U.S. at 654, is no more applicable to this case than is § 249 itself.[28] To permit the New Haven estate to retain the benefit of those services without paying for them would amount to a windfall for the New Haven.

We hold that the court, having found a breach of fiduciary duty, properly tailored the remedy to the nature of the breach it found.

## V.

■ Finally, we address ourselves, as the reorganization court did, 421 F.Supp. at 267–69, to the different footings upon which rest (1) the allowance to Manufacturers for its own compensation and expenses, and (2) the allowance to Manufacturers for compensation and expenses of its attorneys. Whatever may be said arguendo with respect to the merit of the objections to the former, we hold that there is no merit whatever to the objections to the latter.

Under § 77(c)(12) Manufacturers as the indenture trustee filed an application covering both claims referred to above. The court granted the allowance for attorneys' fees to the indenture trustee for and on account of its attorneys, as an expense of the trustee, rather than as direct compensation to the attorneys as claimants. In this respect § 77(c)(12) differs from § 242 of the Bankruptcy Act, 11 U.S.C. § 642 (1970), under which attorneys for specified claimants may apply for compensation on their own behalf.[29] Appellants argue, based on this statutory pattern, that attorneys' fees

---

**26.** The Restatement (Second) of Trusts § 243 (1959), comment c, sets out the following as guidelines for the exercise of a court's discretion in deciding whether a trustee who has committed a breach of trust should receive full compensation or whether his compensation should be reduced or denied:

"(1) whether the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) *whether the trustee's services were of value to the trust.*" (emphasis added).

In this case, Manufacturers beyond doubt acted in good faith and was not at fault for the breach of trust. Although the breach concededly affected the whole trust property and occasioned a loss, the court took that into account in making Manufacturers' compensation contingent on New Haven's recoupment of the loss.

**27.** The court's opinion states that, had it not been for the existence of the conflict of interest, the reorganization court "would, on careful review, ordinarily [have found] that there was sufficient *unchallenged* and competent evi-

dence to qualify [Manufacturers' services] as legitimate charges. . . ." 421 F.Supp. at 263 (emphasis added). Appellants did not challenge the value of the services before us. For this reason, we find it neither necessary nor appropriate for us to review the reorganization court's exercise of discretion in passing on the applications for compensation except to the extent relevant to the conflict of interest.

**28.** That the quoted sentence from *Wolf* refers specifically to § 249 is apparent from the Court's citation of *In re Cosgrove-Meehan Coal Corp.,* 136 F.2d 3 (3 Cir. 1943), which also dealt with § 249.

**29.** Before passage of the Chandler Act in 1938, the predecessor of § 77(c)(12), then codified as 11 U.S.C. § 205(c)(8), provided that the court could,

"within such maximum limits as are fixed by the commission . . . allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and plan by officers, parties in interest, reorganization managers, and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing. . . ."

cannot be paid from the estate when the claimant's right to compensation is in doubt or is denied because of a conflict of interest. On the facts of this case we disagree. We hold that, even if Manufacturers were barred from receiving compensation for its own services, the reorganization court would not have abused its discretion in allowing attorneys' fees to Manufacturers on behalf of Simpson Thacher.

We recognize, as appellants point out, that the discussion of expenses in *Woods* is not really applicable here. In *Woods* the Supreme Court distinguished reimbursement of expenses from compensation for services, explaining:

> "The rule disallowing compensation because of conflicting interests may be equally effective to bar recovery of the expenditures made by a claimant subject to conflicting interests. Plainly expenditures are not 'proper' within the meaning of [§ 242 of] the [Bankruptcy] Act where the claimant cannot show *that they were made in furtherance of a project exclusively devoted to the interests of those whom the claimant purported to represent.* On the other hand, those expenditures normally should be allowed *which have clearly benefited the estate . . . .* Thus where taxes have been paid, needful repairs or additions to the property have been made, or the like, *equity does not permit the estate to retain those benefits without paying for them.* Such classification of expenses, at times difficult, rests in the sound discretion of the bankruptcy court." 312 U.S. at 269–70 (emphasis added).

The Court did not have expenses such as attorneys' fees in mind since attorneys could apply directly to the court for compensation. But the reasons for the difference between §§ 242 and 77(c)(12), see note 29 *supra*, are unrelated to the issue before us. Section 77(c)(12) therefore should not be interpreted to impose a special burden on a claimant in obtaining reimbursement of expenses which would be allowed to the attorneys themselves if they could make their own claim, as under § 242, and which qualify as reimbursable expenses under the criteria articulated in *Woods.*

Applying the *Woods* criteria, we believe there can be no doubt that the attorneys' fees here in question were reasonable expenses "which have clearly benefited the estate." Besides its participation in myriad facets of the New Haven reorganization from its inception on July 7, 1961 until August 30, 1971, Simpson Thacher's services during the *New Haven Inclusion Cases* litigation contributed substantially to the Supreme Court's setting a purchase price for the New Haven's assets about $50 million higher than the price agreed to by the New Haven trustees, or an increase of about 40%. That the purchase price remains un-

---

This language resembles that of 11 U.S.C. § 642. The present § 77(c)(12) was proposed as an amendment during the debates on the Chandler Act. Originally the proposed amendment did not provide for compensation to any participants in a reorganization; it provided only for reimbursement of actual and reasonable expenses. See 79 Cong.Rec. 13304 (1935). Representative Sumners offered an amendment to proposed § 77(c)(12) which became the present section. *Id.* at 13307. In committee the matter of compensating attorneys had been "one of the highly controversial issues". "A large percentage of the committee felt that each class should pay their own attorney fees." The committee rejected this view, however, because it was thought that the difficulties of railroad reorganization were too great to run the risk of creating a disincentive to effective legal representation. "[T]he committee was afraid to take the responsibility to eliminate these fees." *Id.* (remarks of Rep. Sumners). In the debates on the Senate bill, the House amendment was explained further:

> "The present provisions of section 77 allow both expenses and fees to be paid to the designated interested parties out of the debtor's estate. . . . The House Judiciary Committee . . . eliminated fees entirely, allowing only expenses. On further investigation it found that this was too rigorous. The effect of the amendment is to allow expenses to all the interested parties and fees only to trustees under indentures, depositaries, and such assistants as are especially employed by the Commission with the approval of the Judge." *Id.* at 13765 (remarks of Sen. Wheeler).

Thus compensation may be awarded only to a limited class of applicants, but compensation to attorneys may be allowed as a form of expense.

paid is in no way attributable to Simpson Thacher.[30] Although the expenses mentioned in *Woods* (taxes, repairs, additions, "or the like") are more routine than attorneys' fees, and their propriety more easily discernible, their benefit to the estate is not necessarily greater than attorneys' services. Evaluation of the benefit of the attorneys' services here is not a problem because of the quantifiable value of the *New Haven Inclusion Cases* judgment and Judge Anderson's complete familiarity with the entire course of this reorganization. Unlike repairs, payment of taxes, and the like, which usually do no more than preserve the status quo, Simpson Thacher's services contributed very substantially to an increase in the value of the estate's assets. It truly would be inequitable to "permit the estate to retain those benefits without paying for them." 312 U.S. at 270.

Appellants contend that it is Manufacturers' responsibility to pay the attorneys' fees. We fail to see how the fact of its conflict of interest makes Manufacturers, which derived no benefit of its own from the legal representation, responsible for paying Simpson Thacher, notwithstanding Manufacturers' assertion that it probably would feel morally, but not legally, obligated to pay the firm if the estate did not.

Surely the law firm's work for the indenture trustee was "a project exclusively devoted to the interests of those whom the claimant purported to represent." This factor makes appellants' reliance on *Mosser v. Darrow*, 341 U.S. 267 (1951); *In re American Acoustics, Inc.*, 97 F.Supp. 586 (D.N.J. 1951); and *In re Ritz Carlton Restaurant & Hotel Co.*, 60 F.Supp. 861 (D.N.J.1945), misplaced.

In *Mosser* a reorganization trustee who himself did not trade in securities of the debtor's subsidiaries was surcharged for profits made by his two key employees on the ground that he expressly permitted them to engage in such trading. Without such permission the employees would not have remained. We are mindful of the Court's observation in *Mosser* that the strict prohibitions on "profiting out of [a] position of trust", 341 U.S. at 273, "would serve little purpose if the trustee were free to authorize others to do what he is forbidden." *Id.* at 271. That observation is not relevant to the relationship between Manufacturers and Simpson Thacher. Manufacturers did not authorize Simpson Thacher to pursue the conflicting interests that Manufacturers was forbidden to pursue. Manufacturers authorized Simpson Thacher to provide the New Haven interests the "loyal and disinterested service", *Woods, supra*, 312 U.S. at 268, which it knew to be a fiduciary's obligation but which it realized it had become unable to render. We believe that the facts of *Mosser* are completely unlike those of the instant case. The Court in *Mosser* took note of the employees' pursuit of self-interest which was encouraged by the trustee. It was in that context of a "willful and deliberate setting up of an interest in employees adverse to that of the trust" that the Court concluded, "We think that which the trustee had no right to do he had no right to authorize, and that the transactions were as forbidden for benefit of others as they would have been on behalf of the trustee himself." 341 U.S. at 272.

The attorneys who were denied compensation in *American Acoustics* and *Ritz Carlton* had represented conflicting interests themselves. The attorney in *American Acoustics* had no relationship to the trustee. He represented the debtor, its creditors, and the mortgagee in possession, all of whose interests were adverse. In *Ritz Carlton* the court denied compensation to a trustee's attorney when the trustee himself was denied compensation because he had served

---

**30.** Appellants contend that Simpson Thacher itself contributed to the conflict of interest by advising Manufacturers not to resign and to have the two sides of the conflict represented by separate counsel (the so-called "insulation theory"). We do not accept the inference that this legal advice was anything more than an informed choice of the lesser of two evils. We therefore decline to amplify its significance. Simpson Thacher had no dealings with or obligations to the Penn Central interests. It therefore was not tainted itself by the conflict at all. Whatever advice it gave Manufacturers was given solely in the best interests of the New Haven interests.

adverse interests. It is clear from the facts of *Ritz Carlton*, although the point is not made explicitly by the court, that, in representing the trustee who had served adverse interests, the attorney also had represented the adverse interests. In such a situation it is understandable that the trustee and his attorney should be treated alike. That, however, is not the situation in the instant case. Here the trustee and the attorneys self-consciously made sure that whatever taint infected the trustee would not infect the attorneys, so that the bondholders on either side would be protected. We believe that the instant case is distinguishable from *American Acoustics* and *Ritz Carlton*.

We hold under this section of our opinion that the reorganization court acted well within permissible bounds of discretion in granting to Manufacturers an allowance for compensation and expenses of its attorneys, whether or not Manufacturers should have been compensated for its own services. Under the circumstances we do not believe that the provision of § 77(c)(12), by which the indenture trustee claims compensation for its attorneys as an expense, should alter what otherwise would be Simpson Thacher's clear right to compensation.

Affirmed.